**UNITED STATES of America,
Appellee,**

v.

**Roman NEKTALOV, Defendant–
Appellant,**

**Eduard Nektalov, Defendant.**

**Docket No. 05–2780–CR.**

United States Court of Appeals,
Second Circuit.

Argued June 16, 2006.

Decided Aug. 25, 2006.

Richard A. Greenberg, New York, N.Y. (Steven Y. Yurowitz, Newman & Greenberg, New York, NY, of counsel), for Defendant–Appellant.

Bret R. Williams, Assistant United States Attorney, Southern District of New York, New York, N.Y. (Michael J. Garcia, United States Attorney for the Southern District of New York, Karl Metzner, Assistant United States Attorney, Southern District of New York, New York, NY, of counsel), for Appellee.

Before MESKILL, CABRANES, and WESLEY, Circuit Judges.

MESKILL, Circuit Judge.

This is an appeal from a judgment of conviction after a jury trial in the United States District Court for the Southern District of New York, Leisure, J. The primary issue we consider is whether the doctrine of conscious avoidance applies to the money laundering charge in this case arising out of a government sting operation. We hold that it does.

The doctrine of conscious avoidance is indeed susceptible of several well-founded attacks.[1] Nektalov's is not one of them. Rejecting this and Nektalov's other challenges, we affirm the judgment of conviction and sentence.

## BACKGROUND

Defendant-appellant Roman Nektalov ("Roman" or "Nektalov") was indicted on one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 371, and four substantive counts of conducting, or attempting to conduct, financial transactions involving cash represented by law enforcement officers to be the proceeds of narcotics trafficking, in violation of 18 U.S.C. §§ 1956(a)(3)(A),(B) & (C)[2] and 2.

---

1. *See, e.g., United States v. Alston–Graves,* 435 F.3d 331, 337 n. 1 (D.C.Cir.2006) (" '[I]t is hard to see how ignorance, from whatever cause, can be knowledge. A particular explanation of why a defendant remains ignorant might justify treating him as though he had knowledge, but it cannot, through some mysterious alchemy, convert ignorance into knowledge.' ") (quoting Douglas N. Husak & Craig A. Callender, *Wilful Ignorance, Knowledge, and the "Equal Culpability" Thesis: A Study of the Deeper Significance of the Principle of Legality,* 1994 Wis. L.Rev. 29, 52). *See also* Larry Alexander, *Insufficient Concern: A Unified Conception of Criminal Culpability,* 88 Cal. L.Rev. 931, 941 (2000) (discussing "the misclassification of cases of wilful blindness" as cases of knowledge when "[t]he prototypical wilfully blind defendant is, of course, reckless").

2. That statute provides, in pertinent part:

   (3) Whoever, with the intent-

The indictment also sought criminal forfeiture pursuant to 18 U.S.C. § 982 of an aggregate sum of money and 739 loose diamonds seized from Nektalov. The charges stemmed from a government sting operation conducted by an undercover government agent, Miguel Herrera, with the aid of a cooperating witness, Edward Delgado, involving the laundering of funds represented to be the proceeds of international narcotics trafficking.

During a two week jury trial, the government presented voluminous evidence of Delgado's and Herrera's meetings with Roman and his son, Eduard, in their store, Roman Jewelers. These meetings, many of which were tape-recorded, resulted in arrangements for four cash sales, three for gold and one for diamonds. The first was a sale completed in early August 2002 of three kilograms of gold in exchange for approximately $55,000 in bills of small denominations; the second, completed in late August 2002, was for another three kilograms of gold in exchange for $30,000 in cash; and the third, completed in October 2002, was for three kilograms of gold in exchange for $31,332 in cash. The fourth transaction arranged was a sale of diamonds to Herrera in exchange for $500,000 cash. On the day of the sale, Herrera and Delgado met the Nektalovs in a private room at Roman Jewelers, Herrera bringing with him approximately $55,000 in cash in a knapsack. Although Roman had not participated in the prior planning of this transaction, he did actively take part on the day of the sale as Eduard and Herrera selected the diamonds to be sold. When the diamonds had been selected, Herrera said he would leave the $55,000 in cash with Delgado and the Nektalovs and retrieve the balance of the $500,000. After Herrera left, federal agents entered the store and arrested both Eduard [3] and Roman, as well as Delgado (to maintain his cover), and seized the diamonds involved in the transaction.

The government's evidence included voluminous tape recordings and transcripts of the conversations among Roman, Eduard, Delgado [4] and Herrera that, the government argued, proved that the cash had been represented as and was believed to be the proceeds of narcotics trafficking. The premise for the transactions, as Delgado and Herrera explained to the Nektalovs, was that some "product," "stuff" or "shit" was being brought into this country from Colombia and sold "in the streets" for cash in small denominations, and that Herrera was interested in "moving gold" or "moving diamonds" back down to Colombia through couriers. Herrera explained that he had to pay by cash in small denominations because "[t]hat's how they pay me in the streets." To prove Roman's understanding of the illicit source of the

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

18 U.S.C. § 1956(a)(3).

3. Roman's son, Eduard Nektalov (Eduard), who was indicted along with Roman, was killed a month before trial. After the death of his son, Roman was tried alone.

4. Delgado, who had worked next door for eighteen years as the owner of a gold refinery, testified that he had purchased gold from the Nektalovs on numerous occasions from 1998 through 2000 with cash from narcotics traffickers.

cash and Herrera's ostensible reason for converting the cash to gold or diamonds, the government introduced Roman's statements to Delgado regarding Herrera: "Young man, very smart.... He put the money in the diamond. It's better way."

Nektalov did not deny that the transactions occurred, but submitted that the case turned on whether "when these transactions were taking place they were taking place with the knowledge and with the distinct belief on the part of Roman Jewelers and particularly Roman Nektalov that these monies were coming from drug traffickers." Emphasizing Nektalov's difficulties with the English language, his counsel argued that Nektalov did not catch the "innuendos" of illicit activity: "Colombians, stuff, shit.... [T]here is no proof in this record that Roman understood any of those words, not one."

Instructing the jury on how it should assess that crucial issue of Nektalov's belief, and over Nektalov's objection, the court charged:

> In determining whether the defendant acted knowingly and intentionally, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious.
>
> I would like to point out that the necessary knowledge cannot be established by showing that the defendant was careless, negligent or foolish. One may not, however, wilfully and intentionally remain ignorant of a fact material and important to his or her conduct in order to escape the consequences of criminal law. If you find beyond a reasonable doubt that the defendant was aware that there was a high probability

that, for example, the money in which he was conducting financial transactions was the proceeds of narcotics trafficking, but deliberately and consciously avoided confirming this fact, then you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge, unless you find that the defendant actually believed that the money in which he was conducting a financial transaction was not the proceeds of drug trafficking.[5]

The jury returned a guilty verdict on one count of money laundering in violation of 18 U.S.C. §§ 1956(a)(3)(A) & (B) and 2 and a verdict of not guilty with respect to all other counts.[6] Although the Sentencing Guidelines provided for a range of 41 to 51 months imprisonment, the court departed downward in sentencing Nektalov and imposed a ten month "split sentence" (five months imprisonment and five months home confinement), to be followed by a two year term of supervised release. Nektalov was released on bail pending appeal.

## DISCUSSION

### I. Doctrine of Conscious Avoidance

■■■ We review the propriety of a jury instruction de novo. See United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir.2004). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law." Id. (quoting United States v. Walsh, 194 F.3d 37, 52 (2d Cir.1999)). Where, as here, a defendant requested a different jury instruction from the one actually given, the defendant

---

**5.** The court further instructed the jury on the specific application of conscious avoidance to the conspiracy count.

**6.** The count on which Nektalov was convicted was the one arising out of the sale of the

diamonds. He was acquitted on all substantive counts of money laundering arising out of the sale of the gold as well as the conspiracy count.

"bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *Id.* (quoting *United States v. Abelis,* 146 F.3d 73, 82 (2d Cir.1998)).

■ We previously have explored in depth the origins of the doctrine of conscious avoidance. The modern doctrine, as articulated by the United States Supreme Court in *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), is that " '[w]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.' " *Id.* at 46 n. 93, 89 S.Ct. 1532 (quoting Model Penal Code, at 27 (Proposed Official Draft 1962)). *See also United States v. Reyes,* 302 F.3d 48, 54 (2d Cir.2002). Thus, a conscious avoidance instruction is warranted

> (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, *United States v. Civelli,* 883 F.2d 191, 194 (2d Cir.1989), and (ii) the appropriate factual predicate for the charge exists, *i.e.,* the evidence is such that a rational juror may reach the conclusion "beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."

*United States v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir.2003) (quoting *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)).

Nektalov submits two reasons why the conscious avoidance charge should not have been given. First, he argues that the doctrine cannot apply to criminal activity arising out of a government sting operation. Second, he argues that even if the

doctrine may apply to some sting cases, the charge was unwarranted here because there was an insufficient factual predicate.

### A. *Aspect of Knowledge Required for Conviction*

Nektalov's argument that the doctrine of conscious avoidance has no place in sting prosecutions possesses a syllogistic logic. The first premise of the argument is that *knowledge* is not required for a conviction under 18 U.S.C. § 1956(a)(3); *belief* is. The argument's second premise is that the doctrine of conscious avoidance applies only when knowledge is required for conviction. Accordingly, Nektalov contends that the doctrine cannot apply to a money laundering sting.

■ We agree with Nektalov's first premise that 18 U.S.C. § 1956(a)(3) requires belief, rather than knowledge. In a money laundering sting prosecution, the funds used in the transactions are, in fact, *not* the proceeds of an unlawful activity. Conviction under this statute, therefore, cannot require that a defendant "knew" that the funds were the proceeds of an unlawful activity. Instead, it requires that the defendant *"believed* [the property involved in the transactions] to be the proceeds of [a] specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B) (emphasis added).

■ Nektalov's second premise—that conscious avoidance applies only when *knowledge* is required—is invalid. The fallacy lies in Nektalov's extrapolating from the limits of the word "knowledge" in the jury charge the limits of the doctrine of conscious avoidance. In fact, the doctrine applies in the context of a sting operation with as much force to one's efforts to avoid certain belief as to one's efforts to avoid knowledge.

Contrary to Nektalov's contention that belief and knowledge are entirely discrete concepts, belief is more properly understood to be a part of knowledge.[7] *See, e.g.,*

---

7. We reject Nektalov's contention that, con-

ceptually, belief is closer to intent than to

Douglas N. Husak & Craig A. Callender, Wilful Ignorance, Knowledge, and the "Equal Culpability" Thesis: A Study of the Deeper Significance of the Principle of Legality, 1994 WIS. L.REV. 29, 46 ("[G]enuine knowledge requires belief" because "genuine knowledge consists of true belief that is to some extent externally justified." (emphasis added)). Here we are determining the applicability of the conscious avoidance charge in a money laundering sting prosecution. In such a case, any distinction between the concepts of knowledge and belief is a distinction without a difference.

In our opinions examining the doctrine, we have stressed that it is "essential to the concept of conscious avoidance[ ] that the defendant must be shown to have decided not to learn the key fact, not merely to have failed to learn it through negligence." *Rodriguez*, 983 F.2d at 458 (emphasis omitted). Quoting a scholarly treatise, we said that

> [a] court can properly find wilful blindness only where it can almost be said that the defendant actually knew. He suspected the fact; he realised its probability; but he refrained from obtaining the final confirmation because he wanted in the event to be able to deny knowledge. This, and this alone, is wilful blindness.

*Reyes*, 302 F.3d at 54 (quoting Glanville Williams, *Criminal Law: The General Part* § 57, at 159 (2d ed.1961)). Elsewhere we stated that "[t]he rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do

no evil.'" *United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir.1994) (other internal quotation marks omitted). Acknowledging that the doctrine is "not without detractors," we nevertheless have deemed it "a practical necessity given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts that he believes to be true"—an end we wish to avoid because we adjudge " 'deliberate ignorance and positive knowledge [to be] equally culpable.'" *Reyes*, 302 F.3d at 54 (emphasis added) (quoting *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.1976) (en banc)).

■ Against this backdrop the inadequacy of Nektalov's argument is apparent. The culpability of the wilfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision. In other words, the applicability of the doctrine does not turn on the truth of the particular proposition in question, but on what the defendant does to avoid reaching subjective certainty (mistaken or not) about that proposition. Thus, conscious avoidance encompasses a defendant's "deliberately refusing to confirm the existence of one or more facts that he believes to be true," *Reyes*, 302 F.3d at 54 (emphasis added), regardless of whether those facts actually are true.

■ Accordingly, when a defendant claims as a defense to a violation of 18 U.S.C. § 1956(a)(3) that he did not believe that the property involved in the transaction was the proceeds of an unlawful activity, he has asserted the lack of the specific aspect of knowledge required for conviction of that statute. Here, as the district

knowledge. *See, e.g.,* Wayne R. LaFave & Austin W. Scott Jr., *Criminal Law* 218 (2d ed. 1986) ("[B]ecause there are several areas of the criminal law in which there may be good reason for distinguishing between one's objectives and [one's] knowledge, the modern approach is to define separately the mental

states of knowledge and intent.... This is the approach taken in the Model Penal Code [§ 2.02(2)(a) & (b)]."); *see also* Kenneth W. Simons, *Rethinking Mental States,* 72 B.U. L.REV. 463, 476 (1992)("Mental states of belief and mental states of desire are fundamentally different.").

court observed, the focus of Nektalov's defense was his disbelief in the illicit source of the cash. Thus, Nektalov "assert[ed] the lack of [the] specific aspect of knowledge required for conviction," *Aina–Marshall*, 336 F.3d at 170, under 18 U.S.C. § 1956(a)(3), and the first condition for the conscious avoidance charge was satisfied.

Moreover, the district judge's focus on "knowledge" (despite 18 U.S.C. § 1956(a)(3)'s focus on belief) did not render the jury charge erroneous. Although knowledge is, fundamentally, belief substantiated by veracity, belief is tantamount to knowledge in the context of a sting operation. The reason is because punishing the target of a sting assumes the veracity of a defendant's beliefs insofar as it embraces the legal fiction that the defendant has engaged in a "criminal" enterprise. Thus, a defendant who "believes" the representations made by informants in a sting can be said to "know" of the underlying criminal enterprise even though the enterprise does not, in reality, exist. Such a defendant "knows" of the crime in the sense that he is aware that the informants' acts are suggestive of illegal behavior. The fact that the acts are staged by law enforcement does not diminish either the defendant's guilt or our ability to assess his knowledge (or avoidance thereof) with respect to his circumstances or the acts of those around him. Accordingly, the focus on "knowledge" in the jury charge did not reflect an incorrect legal standard. *United States v. Alfisi*, 308 F.3d 144, 148 (2d Cir.2002). ("[W]e will not find reversible error unless a charge either failed to inform the jury adequately of the law or misled the jury as to the correct legal rule.") We therefore turn to the second condition.

### B. *Factual Predicate*

■ Next, we consider Nektalov's claim that the requisite factual predicate did not exist to justify a conscious avoid-

ance instruction. The factual predicate for a conscious avoidance charge is that "the evidence is such that a rational juror may reach the conclusion 'beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.' " *Id.* (quoting *Rodriguez*, 983 F.2d at 458). Where the evidence could support both a finding of actual knowledge and a finding of conscious avoidance, the government may present conscious avoidance as an argument in the alternative. *See United States v. Wong*, 884 F.2d 1537, 1542 (2d Cir.1989).

■ However, a conscious avoidance instruction is "not appropriate where the only evidence alerting a defendant to the high probability of criminal activity is direct evidence of the illegality itself"—that is, "when the evidence is that the defendant had either actual knowledge or no knowledge at all of the facts in question." *United States v. Sanchez–Robles*, 927 F.2d 1070, 1074 (9th Cir.1991) (internal quotation marks and emphasis omitted). In *Sanchez–Robles* the defendant, who was found driving a van that reeked of marijuana, "denied any knowledge of the drugs and claimed that she [did] not recognize the smell of marijuana." *Id.* at 1072. The court held that the conscious avoidance instruction was inappropriate, reasoning that

> [i]f Sanchez–Robles recognized the smell as that of marijuana, then she knew that there was marijuana in the van[.] ... If Sanchez–Robles did not, on the other hand, recognize the smell of marijuana, then she had no reason to be suspicious[.] ... [Her] senses either give rise to direct knowledge of illegality, or there is nothing to raise suspicions of illegality at all.

*Id.* at 1075. Comparing his case to *Sanchez–Robles*, Nektalov argues that the gov-

ernment's evidence is consistent only with a finding of actual knowledge and not conscious avoidance. We disagree.

A jury rationally could find beyond a reasonable doubt that given the circumstances of the transactions in the context of the Nektalovs' prior dealings with Delgado, together with Delgado's and Herrera's statements hinting at the source of the cash and their unambiguous intention to transport the gold and diamonds to Colombia, Nektalov was (mistaken but) certain that the cash used in the transactions was the proceeds of narcotics trafficking. Alternatively, a jury rationally could find beyond a reasonable doubt that Nektalov strongly suspected, but was not completely certain, that the cash used in the transactions was the proceeds of narcotics trafficking—and that he deliberately avoided asking any questions of Delgado or Herrera that might have confirmed his suspicions. Accordingly, the second condition is satisfied. *See Wong*, 884 F.2d at 1542.

Nektalov continues to argue on appeal that the evidence supports a third possible finding, as well—that Nektalov had no idea what Delgado's and Herrera's hints were meant to signify, so that he was not and had no reason to be suspicious. But the conscious avoidance charge in no way interfered with Nektalov's opportunity to present such a defense. He "retain[ed] the opportunity, but ha[d] no obligation, to defeat the inference of knowledge by persuading the jury that [he] actually believed

that" the cash was not the proceeds of narcotics trafficking. *Rodriguez*, 983 F.2d at 458.

Because Nektalov's defense centered on a "lack of [the] specific aspect of knowledge required for conviction" of 18 U.S.C. § 1956(a)(3), and the evidence at trial "[was] such that a rational juror [could] reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact," *Aina–Marshall*, 336 F.3d at 170 (internal quotation marks omitted), we conclude that the conscious avoidance charge was properly given.[8]

## II. *Remaining Claims*

Nektalov's remaining claims of insufficient evidence, error in evidentiary rulings and sentencing error lack merit.

### A. *Sufficiency of Evidence*

Nektalov first argues that his conviction is not supported by sufficient record evidence that the cash was represented by the agents and believed by Nektalov to be the proceeds of narcotics trafficking.

▮▮▮▮ A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden. *See United States v. Cassese*, 428 F.3d 92, 98 (2d Cir.2005). A reviewing court must consider the evidence in the light most favorable to the government, crediting ev-

---

**8.** Nektalov does not challenge the content of the charge except insofar as he argues that the charge's focus on "knowledge" of illicit activity betrays the irrelevance of the doctrine of conscious avoidance to his offense. We reject this argument for the reasons stated above.

Even if we assume *arguendo* that "belief" would have been a more appropriate term for a jury instruction than "knowledge," use of the latter term did not prejudice the defendant. "Knowledge" is more difficult to prove

than "belief" because knowledge requires proof of a belief's objective validity. Accordingly, to the extent the jury may have thought that establishing defendant's avoidance of knowledge required proof of the objective validity of defendant's subjective belief, convicting him would be more, not less, difficult. *Abelis*, 146 F.3d at 82 (holding that a defendant challenging a jury instruction must show that "viewing as a whole the charge actually given, [the defendant] *was prejudiced*.") (emphasis added).

ery inference that the jury might have drawn in favor of the government. *See United States v. Diaz,* 176 F.3d 52, 89 (2d Cir.1999). We "cannot reverse a conviction merely because the defendant's exculpatory account is plausible," *United States v. Friedman,* 998 F.2d 53, 56 (2d Cir.1993), but must uphold the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis omitted).

■ The evidence presented at trial and recounted above was sufficient to support the jury's finding that the government agents represented and Nektalov believed that the cash was the proceeds of narcotics trafficking.

### B. *Evidentiary Rulings*

Nektalov claims that the district court erred in three of its evidentiary rulings: (1) its admission of Delgado's testimony regarding his prior acts of laundering money through Roman Jewelers, (2) its admission of Eduard's "co-conspirator statements," and (3) its admission of the testimony of the government's expert witnesses. We review evidentiary rulings for abuse of the district court's broad discretion, reversing only when the court has "acted arbitrarily or irrationally." *United States v. SKW Metals & Alloys,* 195 F.3d 83, 88 (2d Cir.1999).

■ First, we reject Nektalov's claim of error in the admission of Delgado's testimony regarding his prior purchases of gold from Roman Jewelers on behalf of Colombian narcotics dealers because the testimony was admitted with a proper limiting instruction both contemporaneously and in the final jury charge. Having concluded that this testimony was properly admitted to establish the background of Delgado's relationship with the Nektalovs and to disprove mistake or accident, we do

not reach the alternative grounds advanced for its admission.

■ Next, we reject Nektalov's argument that the court erred in admitting Eduard's tape-recorded statements under Federal Rule of Evidence 801(d)(2)(E) because we find no clear error in the court's finding, at the close of the government's case, that a fair preponderance of evidence independent of the challenged hearsay statements pointed to a conspiracy between Roman and Eduard. *See United States v. Gigante,* 166 F.3d 75, 82 (2d Cir.1999); *United States v. Cicale,* 691 F.2d 95, 103 (2d Cir.1982) ("The standard for independent proof of participation is lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury, and the proof may be totally circumstantial ... [and] need not be overwhelming." (internal citations and quotation marks omitted)). That finding is not undermined by Nektalov's acquittal of the conspiracy charge. *See, e.g., United States v. Domenech,* 476 F.2d 1229, 1232–33 (2d Cir.1973).

Finally, we reject Nektalov's argument that the court erred in admitting the testimony of the government's expert witnesses. The court did not abuse its broad discretion with respect to rulings under Federal Rule of Evidence 702. *See, e.g., United States v. DiDomenico,* 985 F.2d 1159, 1163 (2d Cir.1993) ("[T]he admissibility of such evidence is generally best left to trial judges ... [who have] a much better vantage point than an appellate court to decide whether expert testimony will assist the jury or, in the parlance of the gridiron, will just be piling on."). We cannot say that the court acted arbitrarily or irrationally in allowing testimony that shed some light on the significance of facts that lay jurors unfamiliar with the objectives and practices of money launderers would not otherwise appreciate.

## C. *Sentence and Forfeiture of Diamonds*

■ Nektalov next argues that the district court erred in two ways in imposing sentence. First, he argues, in light of several compelling factors, including Nektalov's age, weakened condition and history of exemplary public service, the court's imposition of a custodial sentence was unreasonable. As Nektalov does not challenge the court's Guidelines calculations and acknowledges that the appropriate factors were "all noted and credited by Judge Leisure," his argument must be understood as challenging the relative weight the district court gave to these factors.

The court thoroughly discussed the reasons for the sentence imposed. The sentence is at the floor of the range that obtained after the court departed ten levels from the Guidelines range—and only half of this sentence is to be served in prison, while the other half is to be served in home confinement. Having considered the entire record, we conclude that this sentence was "well within the broad range of reasonable sentences that the District Court could have imposed in the circumstances presented," *United States v. Fernandez*, 443 F.3d 19, 34 (2d Cir.2006), and accordingly, we do not review the relative weight given to the competing factors, id. at 32 ("The weight to be afforded any given argument made pursuant to one of the § 3553(a) factors is a matter firmly committed to the discretion of the sentencing judge and is beyond our review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.").

■ Nektalov's final argument that the court exceeded its authority in ordering the forfeiture of the 739 loose diamonds that were seized at the time of Nektalov's June 4 arrest is foreclosed by the plain language of the statute. 18 U.S.C. § 982(a)(1) provides, in pertinent part: "The court, in imposing sentence on a person convicted of an offense in violation of section 1956 ... of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." The diamonds were the corpus of the substantive count on which he was convicted.

Nektalov does not dispute that the 739 seized diamonds were present at his meeting with the government's informants immediately prior to his arrest; nor does he deny that the diamonds were assembled there so that they could be sorted and examined in preparation for the impending transaction. Instead he asserts without citation to any authority that the jury's finding that the value of the property to be laundered was $55,200 vitiated the court's authority to order forfeited the personal property itself, which was appraised at values far above $55,200.[9] Nektalov further argued that the diamonds subject to forfeiture should have been limited in total value by that amount or, in the alternative, by the $500,000 amount referenced in the government's indictment. As Nektalov has pointed to no authority that would contradict the plain language of the forfeiture statute, we cannot conclude that the forfeiture order was error.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the district court in all respects.

---

9. The evidence at trial was that the government's appraisal of the diamonds was close to $2 million, and the defendant's appraisal was $315,000.