19-2189(L)
United States v. Acosta, Diaz

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of November, two thousand twenty.

PRESENT:
> JON O. NEWMAN,
> RICHARD C. WESLEY,
> JOSEPH F. BIANCO,
> *Circuit Judges*.

_____

United States of America,

> *Appellee*,

> v.                                19-2189(L); 19-2294(CON)

Robert Acosta, AKA Robert Acevedo-Acosta, AKA Ruberto Mojico, AKA Robert Mojicaisaacs, Jose Diaz, AKA Cano,

> *Defendants-Appellants*.

_____

For Appellee:                             NICHOLAS CHIUCHIOLO, Assistant United States Attorney (Michael Krouse and Thomas McKay, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY.

For Defendant-Appellant Acosta:   THOMAS EDDY (Patrick Jerome Brackley, *on the brief*), Law Office of Patrick J. Brackley, New York, NY.

For Defendant-Appellant Diaz:   JEREMIAH DONOVAN, Law Offices of Jeremiah & Terry Donovan, Old Saybrook, CT.

Appeal from judgments of conviction of the United States District Court for the Southern District of New York (Castel, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order of the district court is **AFFIRMED**.

Robert Acosta and Jose Diaz appeal from judgments of conviction, entered July 12, 2019, following a three-week jury trial. Both Acosta and Diaz were convicted for their role in the murders of Alex Ventura ("Ventura" or "Alex Ventura") and Aneudis Almonte on December 22, 1997, in the Bronx, New York. Specifically, both Acosta and Diaz were convicted of: (1) one count of conspiring to commit a murder-for-hire, in violation of 18 U.S.C. § 1958; and (2) two counts of the commission of a murder-for-hire, which resulted in the deaths of Ventura and Almonte, respectively, in violation of 18 U.S.C. §§ 1958 and 2. Acosta was separately convicted of two counts of murder, during and in relation to a conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, in connection with the Ventura and Almonte murders, respectively. Diaz was separately convicted of using a firearm during and in relation to the Ventura murder, in violation of 18 U.S.C. §§ 924(j) and 2. The district court sentenced both defendants principally to life imprisonment.

We assume the parties' familiarity with the underlying facts and procedural history, which we reference only as necessary to explain our decision to affirm.

## I. Sufficiency of the Evidence

We review challenges to the sufficiency of the evidence *de novo*. *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008). However, "we must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, brackets, and quotation marks omitted), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017). Thus, an appellant claiming insufficient evidence bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004) (quotation marks omitted), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). A conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In summary, construing the trial record in the light most favorable to the government, the evidence at trial established the following: Acosta was the leader of a crew that trafficked large quantities of cocaine in northern Manhattan in the 1990s. In the summer of 1997, two of Acosta's workers stole roughly $200,000 in drug proceeds from one of his stash houses. To retaliate, Acosta sought the help of a family friend, Richard Collado, to punish the burglars. Collado introduced Acosta to Diaz. Acosta then hired Diaz to kill the two workers whom Acosta had come to suspect were responsible for the theft of the drug proceeds. Diaz expressed to Collado that killing the two individuals responsible for the burglary was a two-person job; Diaz recruited an associate, Charles Sanders, to assist Diaz. On December 22, 1997, Diaz and Sanders lured the two workers, Ventura and Almonte, to an apartment building in the Bronx and ambushed them in a stairwell. Sanders

3

repeatedly stabbed Almonte, and Diaz shot Ventura in the head. Both victims died from their wounds.

Acosta and Diaz challenge the sufficiency of the evidence on several grounds. First, Acosta argues that the evidence was insufficient to satisfy the jurisdictional element under 18 U.S.C. § 1958, which requires the use of an interstate commerce facility in the commission of a murder-for-hire. Second, Acosta contends that there was insufficient proof at trial to establish the existence of an ongoing narcotics conspiracy, or the intent to kill Ventura, as required for a conviction under 18 U.S.C. § 848(e)(1)(A). Finally, Diaz asserts that all of his convictions should be vacated because they were based almost entirely upon unreliable testimony of cooperating witness Collado. Diaz Br. at 47–48. We conclude that all of these sufficiency challenges are without merit.

With respect to Acosta's challenge to the jurisdictional element under 18 U.S.C. § 1958, the government may establish that a defendant used "any facility of interstate . . . commerce" in the commission of the murder-for-hire through proof that an interstate telephone call facilitated the murder, or proof that an intrastate call made on an interstate telephone network facilitated the murder. *See United States v. Perez*, 414 F.3d 302, 304–05 (2d Cir. 2005). Here, the government offered, among other things, evidence that Acosta's mother asked Collado to find someone to kill the men who had stolen her son's drug money. As to the interstate nature of this call, there was trial testimony that Acosta, while at a restaurant in the Bronx, handed a cell phone to Collado who spoke to Acosta's mother, who was in Miami, regarding the murder request. This evidence clearly established that an interstate telephone call, between New York and Florida, was used to facilitate the murder-for-hire plot. Therefore, on this testimony, there was sufficient evidence to satisfy the jurisdictional element under 18 U.S.C. § 1958.

4

Although Acosta asserts that Collado's call with Acosta's mother was erroneously admitted, we disagree. Collado's conversation with Acosta's mother was admissible as a statement between co-conspirators under Federal Rule of Evidence 801(d)(2)(E). Acosta contends that the substance of the conversation was not related to the murder-for-hire conspiracy because Acosta's mother was not a member of the conspiracy. However, it was reasonable to infer that Acosta might seek his mother's help in handling problems with his drug business, especially in light of the evidence that she was one of the few people that Acosta trusted, Acosta sent her his drug profits for safekeeping, and, after a robbery in 1994, she sent Acosta money to pay a drug supplier he owed. Moreover, Collado testified that Acosta's mother asked that the burglars be "fixed up," which he understood to mean to murder them. App'x at 1114. In short, it was not an abuse of discretion to admit the evidence, and Acosta's challenges were factual questions for the jury to resolve in their weighing of the evidence, with no basis on this record to disturb their rational finding. *See United States v. Gupta*, 747 F.3d 111, 124 (2d Cir. 2014).

Next, with respect to the conviction under 21 U.S.C. § 848(e)(1)(A), Acosta contends that there was insufficient evidence at trial to support a finding by the jury of an ongoing drug conspiracy at the time of the murders. For a conviction under this statute, the government must prove that, while "engaging in" a qualifying drug offense (which includes a drug conspiracy), the defendant "intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." 21 U.S.C. § 848(e)(1)(A). We have made clear that the government need only prove that "*one* motive for the killing (or conspiracy to kill) was related to the drug conspiracy." *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008) (emphasis in original). Additionally, with respect to the drug conspiracy that is serving as the predicate offense, the "engaging in" element of § 848(e)(1)(A) is satisfied "[s]o long as the

5

defendant enters into the unlawful agreement before the killing, and the conspiracy is ongoing when the killing occurs." *United States v. Santos*, 541 F.3d 63, 68 (2d Cir. 2008).

The government introduced a plethora of evidence to support a rational finding by the jury that Acosta was actively engaged in an ongoing drug conspiracy at the time of the murders. First, Carlos Taveras, one of Acosta's workers who packaged and sold drugs on his behalf, testified that he was working at one of Acosta's drug locations the night of the murders. Taveras testified that he worked until midnight that evening and returned to the same location for work at noon the following day. Taveras further testified that he continued to work at that location until he was arrested and incarcerated several months *after* the murders. Moreover, Collado testified that he began working full time for Acosta's drug organization several months after the murders, and that Acosta's business continued to operate from two of Acosta's drug locations. In addition, the compelling evidence that the motive for the murders was to seek revenge on those responsible for the burglary of Acosta's stash house, although alone insufficient to satisfy the "engaging in" element, served as additional evidence from which the jury could find that the drug conspiracy was ongoing at the time of the murders. *See id.* at 68, 75. In short, viewing the record in the light most favorable to the government, the evidence was sufficient for a rational jury to conclude that Acosta was engaged in an ongoing narcotics conspiracy at the time of the murders.

Acosta next argues that there was insufficient evidence for the jury to find that he intentionally caused the death of Alex Ventura because he hired Diaz to kill Hinton Ventura, not Alex Ventura, and the jury was not instructed on the doctrine of "transferred intent." Acosta Br. at 52–55.[1] This argument is also unpersuasive. The doctrine of transferred intent permits the jury

---

[1] The evidence at trial established that Hinton Ventura, who was Alex's brother, managed one of Acosta's drug distribution locations in Manhattan. According to the government's proof, Acosta initially suspected Hinton and Almonte were the two workers who had stolen over $200,000 from the location and, thus, Acosta had hired Diaz to kill them even though it was actually Alex (not Hinton) and Almonte who had taken the money.

6

to attribute or "transfer" the intent to kill, when a defendant shoots at one person with intent to kill, but inadvertently kills another person. *United States v. Rahman*, 189 F.3d 88, 141 (2d Cir. 1999). The case at hand, however, is not an inadvertent shooting. Diaz pointed a gun to Alex Ventura's head and pulled the trigger, killing him instantly. It is indisputable that this was an intentional killing, as the district court correctly defined it. Although it was Acosta's original intention that Hinton Ventura (not Alex Ventura) be killed, the jury could have rationally inferred that his motive and broader intent was to kill the individual responsible for the burglary (whom he initially believed to be Hinton Ventura), and thereby aided and abetted in the murder of Alex Ventura for that burglary. Such a rational inference regarding Acosta's broader intent could have been drawn from the evidence the government provided to the jury establishing that Acosta's motive for the killing was drug related, as well as the evidence that, after learning that Alex Ventura (and Almonte) had been killed, instead of Hinton Ventura, Acosta still directed Collado to pay Diaz for carrying out the murders. In sum, the government introduced sufficient evidence from which a rational jury could find that Acosta had the requisite intent in connection with the killing of Alex Ventura.

Finally, Diaz challenges the sufficiency of the evidence of his guilt "[g]iven the character of [Collado] on whose testimony the convictions rested." Diaz Br. at 46. This legal contention is foreclosed by our binding precedent. In assessing sufficiency arguments, this Court must defer to the jury's assessment of witness credibility. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). More specifically, we have emphasized that it is "well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quoting *United States v.*

7

*Parker*, 903 F.2d 91, 97 (2d Cir. 1990)).  Diaz fails to persuasively explain why Collado's testimony could not be credited, and relied on, by the jury.  Collado was subject to two days of vigorous cross-examination by defense counsel, in which counsel sought to undermine his credibility and attack his character.  Based on its verdict, the jury ultimately credited Collado's testimony, which was corroborated by other witnesses and exhibits admitted into evidence.  Therefore, Diaz's challenge to his conviction through an attack on Collado's credibility is unavailing.

Accordingly, all of Acosta and Diaz's arguments regarding the sufficiency of the evidence fail based upon the trial record.

## II.    Alleged Juror Misconduct

Acosta and Diaz argue that the district court erred in its handling of alleged juror misconduct, that is, on the first day of deliberations, two jurors may have had a conversation regarding the case outside the presence of other jurors.

The circumstances surrounding this particular issue can be summarized as follows: On March 27, 2019, the district court charged the jury, and the jurors deliberated for the remainder of the afternoon.  Before the jurors left the courtroom to deliberate, the district court instructed the jury that they must only deliberate with all 12 jurors present.  The next morning, the district court informed the parties that another attorney observed one juror speaking to another juror and believed that the juror was "discussing the case."  App'x at 2048.  The attorney overheard one juror ask another juror, "So what do you think?"  App'x at 2049.  The listening juror looked at the other juror "strangely," and the other juror continued by stating, "Well, I'm glad he broke it down that way.  I don't want to send a person to prison if he didn't do it so I am glad they are handling it that way."  App'x at 2049.  After hearing this information, and consulting with counsel about

8

whether to question the jurors about their conversation and ability to be impartial, the district court declined Diaz's request that the juror who made the statement be dismissed, as well as Acosta's request that both jurors be excused. Instead of questioning the individual jurors or dismissing them, the district court gave a strongly-worded instruction to the entire jury which: (1) reminded the jury of the instruction regarding discussing the case only when all 12 jurors are present; (2) alerted the jury that it had come to the district court's attention that two jurors were overheard discussing the case as they exited the courthouse; (3) emphasized that such a discussion was "improper conduct" that is "a violation of the Court's instructions"; and (4) directed the jury not to discuss the incident, all "to make sure that [the jury] understood what the rules are so that there is not a repetition." App'x at 2053–54.

"It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Cox*, 324 F.3d 77, 86 (2d Cir. 2003) (quotation marks omitted). Once jurors are instructed to refrain from premature deliberation but nevertheless discuss the case, such behavior may constitute juror misconduct. *Id.* Such misconduct can occur even after deliberations commence, if two or more jurors deliberate outside the presence of all twelve jurors contrary to the district court's instruction. If a district court is "[f]aced with a credible allegation of juror misconduct during trial, a court has an obligation to investigate and, if necessary, correct the problem." *United States v. Haynes*, 729 F.3d 178, 191 (2d Cir. 2013). A district court's investigation of juror misconduct is a "delicate and complex task." *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997). This Court reviews a trial judge's handling of juror misconduct for abuse of discretion. *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006).

9

The district court did not abuse its discretion in handling the alleged juror misconduct. Given that neither defendant requested that the jurors involved be questioned about the substance of the conversation, and that questioning jurors itself may "highlight[] the issue unnecessarily, disrupt[] the trial, and impair[] the ability of the jurors to deliberate with each other," the district court approached the alleged misconduct in a balanced manner. *Cox*, 324 F.3d at 88. The alleged misconduct at issue appeared to be a few brief statements from one juror to another after deliberations commenced and were ambiguous as to whether they constituted improper deliberations because the juror's statements could have easily been a reference to the court's instruction about the burden of proof, which had occurred earlier in the day. Importantly, "[n]ot every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation." *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004). In any event, the comments suggest that the juror was taking the oath seriously by understanding the gravity of the charges and the consequences for the defendants.

In addition, there was an insufficient basis to dismiss either juror where one juror was merely talking to the other juror about the general importance of ensuring that they did not convict an innocent man. Similarly, although one defense counsel requested that the other juror be asked whether her ability to be fair and impartial had been impacted by the conversation, the district court did not abuse its discretion in declining to do so, especially given the benign nature of the comments and that "the possibility of any far-reaching conversation regarding views on the case was minimal." *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998). Instead, the district court acted prudently in addressing the intra-jury communications by reminding the jury that it may not deliberate without the entire group present and making clear that such conduct would be

10

a violation of the district court's rules. *See United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994) ("The court has broad flexibility in such matters, especially when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences." (quotation marks omitted)). Under these particular circumstances, the district court's "reiteration of its cautionary instructions to the jury is all that [was] necessary." *Abrams*, 137 F.3d at 708 (quoting *Thai*, 29 F.3d at 803). We find no abuse of discretion in the district court's handling of the alleged juror misconduct.

## III.    Collado's Out-of-Court Identifications

Diaz argues that the district court erred by allowing NYPD Detective Michael Lagiovane to read to the jury prior consistent statements by Collado, regarding his identification of Diaz and another individual as involved in the murders, because there was insufficient evidence in the record that Collado was the person who made the identifications. It is a well settled principle that the district court has "broad discretion" over the admission of evidence. *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006). Thus, a district court's ruling regarding the admission of evidence is reviewed for abuse of discretion and reversed only when the district court has acted "arbitrarily or irrationally." *Id.* (quotation marks omitted). When an objection has not been raised below, it is reviewed on appeal for plain error. *United States v. Marcus*, 560 U.S. 258, 262 (2010). Diaz's argument, raised for the first time on appeal, is without merit.

After the murders, Collado became an informant for the Drug Enforcement Administration ("DEA") and told his DEA handler about his involvement in the killing of Ventura and Almonte. Collado explained to him that Acosta ordered the murders and that two individuals, whom he knew only by nickname, were responsible – "Cano" (Diaz) and "Chucky" (Sanders). App'x at 849. Collado further testified that he was then interviewed and shown photobooks over the course of

11

several days, by NYPD detectives investigating the murders, to determine if he could identify the perpetrators. Collado ultimately identified Diaz and Sanders. Detective Lagiovane was present for both identifications and prepared reports memorializing them, but by the time of trial did not recall the identifications or the identity of the informant, and thus read the reports of the identifications into the record as prior recollections recorded under Federal Rule of Evidence 803(5). The reports read into the record did not contain Collado's name, but rather referred to an unnamed confidential informant identifying photos of Diaz and Sanders as those responsible for the murders. Diaz objected to the admission of this evidence as "double hearsay." App'x at 1145. After hearing argument, the district court overruled the objection under Federal Rule of Evidence 801(d)(1)(B) because the statements of Collado memorialized in the NYPD reports were prior consistent statements offered "to rebut an express or implied charge that the declarant, meaning Mr. Collado, recently fabricated or acted from a recent improper influence or motive in testifying in this case." App'x at 1151.

On appeal, Diaz does not argue that the elements of a prior consistent statement, or the foundation for past recollection recorded, were not met in connection with this testimony. Instead, he contends that the testimony was inadmissible because there was an insufficient basis to establish that Collado was the confidential informant who made the prior statements and identifications. That particular argument, however, was not raised before the district court. In fact, in objecting to the evidence at trial on "double hearsay" grounds, Diaz's counsel accepted that Collado was the declarant of the statement and identifications. *See* App'x at 1146 ("[A]ll of this is just information that was told to [Detective Lagiovane] by Mr. Collado.").

In any event, it is axiomatic that "[i]dentity can be inferred through circumstantial evidence." *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994). Here, there was sufficient

12

circumstantial evidence in the record to support a rational inference that Collado was the unnamed confidential informant in the reports who had made the statements and identifications. In particular, both Collado and his DEA handler testified that Collado provided information to the NYPD detectives about the murders, and there was no evidence that the NYPD had more than one informant during the initial investigation into the murders. Moreover, there were many consistencies between the NYPD reports and Collado's testimony regarding the timeframe and substance of the interviews. For example, the dates of the reports, January and February 2000, were consistent with Collado's testimony that he met with the NYPD several times in November or December of 1999 after returning from the Dominican Republic, when he identified Diaz and Sanders. In addition, the reports were consistent with Collado's testimony that he identified the photographs of the two individuals on different dates and only by their nicknames. Diaz argues that the confidential informant was someone other than Collado because the reports do not reference all the officers with whom he recalled speaking, and one of the reports states that the identification occurred at a different precinct from the one Collado mentioned. Given that Collado was testifying at trial more than 18 years after making the identifications, and in light of the strong circumstantial evidence that Collado was the declarant in those reports, any such discrepancies go to the weight, not the admissibility, of the records. *See United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("[F]actors which make evidence less than conclusive affect only weight, not admissibility." (quotation mark omitted)). In short, the district court did not abuse its discretion, much less plainly err, in its admission of this evidence.

### IV.    Diaz's Post-Arrest Statements

Acosta contends that his Confrontation Clause rights were violated by the district court when it admitted three statements made by Diaz following his arrest. "Alleged violations of the

Confrontation Clause are reviewed *de novo*, subject to harmless error analysis." *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006).

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). A statement is testimonial if it "was given with the primary purpose of creating an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 250–51 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). Acosta's challenges under the Confrontation Clause fail because none of the three post-arrest statements by Diaz fall into this ambit of testimonial statements. The first statement occurred at the FBI offices, when Acosta and Diaz passed each other in the hallway, and Diaz asked the agent, "Who is that guy?" App'x at 1415. Later that day, while in the waiting room at the Pretrial Services Office in the courthouse, an agent overheard Diaz spontaneously say to himself, "I know who that guy is," referring to Acosta. App'x at 1416. Given that neither of these statements were made in response to any questioning by the police, it is clear that such statements were not made as a substitute for trial testimony. The third statement at issue occurred when, while Diaz was speaking to his ex-wife over the telephone, he was heard saying, "I think I'm going to cooperate. I am thinking about cooperating." App'x at 1417–18. Such a statement, also not in response to any questioning by the police, is non-testimonial. *See Clark*, 576 U.S. at 249 ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."). In any event, given the fact that none of these statements by Diaz directly implicated Acosta in any crime, any Confrontation Clause error was harmless because it is clear, based upon the trial record, "beyond a reasonable doubt that the error

14

complained of did not contribute to the verdict obtained." *United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007) (quotation marks omitted).

## CONCLUSION

We have reviewed the remainder of Acosta and Diaz's arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court