07-2193-cr (L)
*USA v. Applins*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2009

(Argued: June 10, 2010                          Decided: March 1, 2011)

Docket Nos. 07-2193-cr(L);
07-2194-cr; 07-2217-cr; 07-2312-cr; 07-2372-cr; 09-0225-cr

---

UNITED STATES OF AMERICA,

*Appellee*,

v.

BILLY J. APPLINS, JAMES KELLY, NATHAN SPEIGHTS, JOSEPH DERBY, LONNIE SINGLETARY, GREGORY GRIFFIN, ANDRE APPLINS, TYLER WILLIS, SKYLER WILLIS,

*Defendants*,

CHARMISH SINGLETARY, DENNIS JONES, JERRAWN THOMAS, GREGORY THOMAS, WILLIAM ROBINSON, ISMAIL PIERCE,

*Defendants-Appellants.*[*]

---

Before:        MINER, SACK, AND HALL, *Circuit Judges*.

Defendants-appellants appeal from judgments of conviction and sentence entered in the United States District Court for the Northern District of New York (Mordue, *C. J.*), convicting them of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), following pleas of guilty by two appellants and verdicts of guilty as to the remaining five appellants, the jury having determined that the pattern of racketeering activity included conspiracy to distribute and/or possess with intent to distribute 50 grams or more of cocaine base, and the district court having imposed upon the appellants terms of imprisonment ranging from 214 months to life.

Affirmed as to all convictions and sentences, except remanded for resentencing of defendant-appellant Gregory Thomas.

---

[*] The Clerk of the Court is respectfully directed to amend the caption as set forth above.

STUART J. LaROSE, Law Office of Stuart J. LaRose, Syracuse, New York, *for defendant-appellant* Charmish Singletary.

ALBERT J. MILLUS, Hinman, Howard & Kattell, L.L.P., Binghamton, New York, *for defendant-appellant* Dennis Jones.

DAVID M. SAMEL, Law Office of David M. Samel, New York, New York, *for defendant-appellant* Jerrawn Thomas.

JAMES E. LONG, Law Office of James E. Long, Albany, New York, *for defendant-appellant* Gregory Thomas.

DANIEL A. HOCHHEISER, Hochheiser & Hochheiser, New York, New York, *for defendant-appellant* William Robinson.

KIM P. BONSTROM, Law Office of Kim P. Bonstrom, Shelter Island, New York, *for defendant-appellant* Ismail Pierce.

ELIZABETH S. RIKER, Assistant United States Attorney (John M. Katko, John G. Duncan, Assistant United States Attorneys, *of counsel*; Richard S. Hartunian, United States Attorney for the Northern District of New York), *for Appellee*.

MINER, *Circuit Judge*:

Defendants-appellants appeal from judgments of conviction and sentence entered in the United States District Court for the Northern District of New York (Mordue, *C.J.*), for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. All were convicted under a one-count indictment charging conspiracy to violate the provisions of 18 U.S.C. § 1962(c) (prohibiting participation in the affairs of an enterprise through a pattern of racketeering activity). The conspiracy was charged as a violation of 18 U.S.C. §1962(d). Two of the defendants-appellants entered into plea agreements prior to trial. A jury found that the remaining five appellants agreed to participate in a pattern of racketeering activity that included conspiracy to distribute and/or possess with intent to distribute 50 or more grams of crack cocaine. The district court sentenced all defendants-appellants to terms of imprisonment. The terms ranged from 214 months to life. The sentences included terms of supervised release of four to five years and $100 special assessments.

On appeal, the defendants-appellants now bring a host of challenges to their convictions and sentences. We examine with particularity three of the arguments raised by them: (1) whether the existence of a RICO enterprise is a necessary element that the government must prove to establish a RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) whether there was sufficient evidence to prove an agreement that an enterprise would be established; and (3) whether the district court's failure to require unanimity as to which predicate acts the defendants agreed to commit was reversible error, the district court having instructed the jury that it must find that each defendant agreed to commit at least two racketeering acts and agree unanimously on the type of racketeering acts each defendant agreed to commit. Because all of the defendants' claims are ultimately without merit, for the reasons that follow we affirm the judgments of conviction in all respects but remand defendant-appellant Gregory Thomas's case to the district court for resentencing in light of Kimbrough v. United States, 552 U.S. 85 (2007).

**BACKGROUND**

I.    Prior Proceedings

This case arises out of the involvement of defendants-appellants in the Elk Block gang. The gang's territory, located in Syracuse, New York, was bordered by South Salina Street on the west, Interstate 81 on the east, Colvin Street on the north, and McAllister Avenue on the south. On July 20, 2005, the seven defendants-appellants, Charmish Singletary, Dennis Jones, Jerrawn Thomas, Gregory Thomas, William Robinson, Ismail Pierce, Ronnie Parnell (collectively, the "appellants"), along with nine co-conspirator defendants, Billy J. Applins, James Kelly, Nathan Speights, Joseph Derby, Lonnie Singletary, Gregory Griffin, Andre Applins, Tyler Willis, Skyler Willis (collectively, the "defendants") (the defendants and appellants, collectively, the "Elk Block Gang" or "Elk Block"), were named in the indictment returned by a grand jury in the United States District Court for the Northern District of New York. Those named in the indictment were accused of being "members and associates of a criminal organization in Syracuse, New York, known as Elk Block, whose members and associates engaged in murders, attempted murders, drug trafficking, witness

tampering[1] and other crimes within the Northern District of New York and elsewhere." The indictment alleged that the Elk Block Gang, including its "leadership, members, and associates, constituted an enterprise as defined by [18 U.S.C. § 1961(4)]" and that its members conspired to participate in the affairs of the Elk Block enterprise through a pattern of racketeering activity. The indictment also alleged, with regard to the history and development of Elk Block, that

> [b]eginning in or about 1995, the exact date being unknown to the grand jury, and continuing thereafter up to the date of the indictment, in the Northern District of New York and elsewhere, the defendants . . . together with others known and unknown to the grand jury, being persons employed by and associated with the enterprise known as Elk Block, described in paragraphs 1 through 11 of this indictment, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly and intentionally, did combine, conspire, confederate, and agree together and with each other and with others known and unknown to the grand jury, to violate [18 U.S.C. §]1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in [18 U.S.C. §] 1961(1) and 1961(5), consisting of multiple acts involving: (1) murder, in violation of New York Penal Law sections 125.25, 110.05 and 105.17, and (2) conspiracy to possess with intent to distribute more than 50 grams of cocaine base (crack) and marijuana, as well as possession with intent to distribute and distribution of more than 50 grams of cocaine base (crack) and marijuana, in violation of [21 U.S.C. §§] 841(a) and 846; and (3) witness tampering, in violation of [18 U.S.C. §] 1512(b)(3).
>
> It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

The indictment described fifty-four racketeering acts, including multiple occasions of narcotics possession and distribution, firearms possession, shootings, and murder.

Pursuant to a plea agreement executed March 21, 2006, appellant Charmish Singletary pleaded guilty to the conspiracy charged in the indictment and admitted to involvement in seven racketeering acts. By virtue of his plea, Singletary admitted to having been responsible either directly or through relevant conduct of his co-conspirators for the distribution of more than 50 but less than 150 grams of crack-cocaine and for possession of a dangerous weapon in connection with his drug trafficking activity. On May 4, 2007, Singletary received a sentence of a 214-month term of

---

[1] The witness tampering allegation was abandoned by the government before the case was submitted to the jury.

imprisonment, a five-year term of supervised release, and a $100 special assessment. Judgment was entered on May 9, 2007, and Singletary timely appealed.

Pursuant to a sealed plea agreement executed February 27, 2006, appellant Ronnie Parnell also pleaded guilty to the conspiracy charge. On May 9, 2007, Parnell received a sentence of a 45-month term of imprisonment, a four-year term of supervised release, and a $100 special assessment. Parnell's term of imprisonment was reduced to 37 months on April 10, 2008, pursuant to an amendment to the crack-cocaine guidelines set forth in U.S.S.G. § 2D1.1(c). Parnell served his 37-month term of imprisonment, but on November 20, 2008, the district court held a revocation hearing at which Parnell admitted to violating five conditions of supervised release. The court then imposed a fifty-month term of imprisonment for Parnell's violations of supervised release. Judgment was entered December 1, 2008, and Parnell timely appealed on December 3, 2008.[2]

In addition to appellants Singletary and Parnell, nine co-defendants, Billy J. Applins, James Kelly, Nathan Speights, Joseph Derby, Lonnie Singletary, Gregory Griffin, Andre Applins, Tyler Willis, and Skyler Willis, pleaded guilty and were sentenced to terms of imprisonment ranging from 37 to 121 months, terms of supervised release of 4 to 5 years, and a $100 special assessment.

The remaining five appellants — Dennis Jones, Jerrawn Thomas, Gregory Thomas, William Robinson, and Ismail Pierce — proceeded to trial on the indictment. The trial commenced on November 20, 2006. Cooperating defendants, who were former Elk Block gang members, and numerous law enforcement witnesses testified at trial regarding Elk Block's geographic territory, gang signs, graffiti, clothing, tattoos, drug dealing, use of firearms, and utilization of violence for the protection and maintenance of control over the cocaine base (crack) sales in Elk Block territory. At trial, there was also evidence of a multitude of shootings and several murders. On December 19,

---

[2] Lisa A. Peebles, First Assistant Federal Public Defender and counsel for Parnell, filed a motion with this Court to withdraw pursuant to Anders v. California, 386 U.S. 738 (1967), and the government responded by moving for summary affirmance. By order of this Court dated June 23, 2010, Parnell's appeal docketed under 08-5961-cr was severed from these appeals, decision on the Anders motion was deferred, and Parnell's case was remanded, pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), to the district court for entry of a written statement of its reasons for imposing a non-Guidelines sentence, pursuant to 18 U.S.C. § 3553(c)(2).

2006, following four weeks of trial and two days of deliberations, the jury rendered guilty verdicts as to all five defendants including findings that Dennis Jones, Jerrawn Thomas, Gregory Thomas, William Robinson, and Ismail Pierce each agreed to a pattern of racketeering activity that included conspiracy to distribute and/or possess with intent to distribute 50 grams or more of cocaine base.

The five appellants who proceeded to trial filed post-trial motions for judgment of acquittal, pursuant to Rule 29, and, alternatively, for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, raising various arguments as to the adequacy of the jury instructions, the sufficiency of the evidence to sustain their convictions, and the admission of certain evidence and testimony at trial. On May 11, 2007, the district court denied the appellants' arguments and motions in their entirety. United States v. Jones, No. 05-CR-322 (NAM), 2007 WL 1428464, at *13 (N.D.N.Y. May 11, 2007).

On May 14, 2007, appellants Jerrawn Thomas and William Robinson appeared in the district court for sentencing, and each received a term of imprisonment of life, a term of supervised release of five years in the event either is released, and a $100 special assessment. Judgment was entered on May 18, 2007, and Jerrawn Thomas timely appealed to this Court on that same day. William Robinson filed a timely notice of appeal on May 21, 2007.

On May 16, 2007, appellant Dennis Jones appeared in the district court for sentencing and received a term of imprisonment of thirty years, a term of supervised release of five years, and a $100 special assessment. Judgment was entered on May 18, 2007, and Jones timely appealed to this Court on May 22, 2007.

On May 23, 2007, Gregory Thomas appeared in the district court for sentencing and received a term of imprisonment of thirty years, a term of supervised release of five years, and a $100 special assessment. Judgment was entered in the district court on June 6, 2007, and Gregory Thomas's May 25, 2007 notice of appeal to this Court is deemed timely filed on June 6, 2007, pursuant to Federal Rules of Appellate Procedure 4(b)(2).

On January 12, 2009, Ismail Pierce appeared for sentencing in the district court and received a term of imprisonment of 324 months, a term of supervised release of five years, and a $100 special assessment. Judgment was entered on January 14, 2009, and Pierce's January 13, 2009 notice of appeal to this Court is treated as timely filed on January 14, 2009, pursuant to Federal Rules of Appellate Procedure 4(b)(2).

II.     Evolution of the Elk Block Enterprise

At trial, the government's case-in-chief included testimony of numerous law enforcement officers and investigators who testified with regard to various matters relating to the gang and its members, including prior arrests of the appellants on drug and firearms charges, investigations of gang-related shootings, and evidence derived from the execution of search warrants. Elk Block members Billy Applins, Kelly, Parnell, Speights, and Andre Applins testified as cooperators. The government also introduced numerous exhibits including crack-cocaine and firearms that had been seized in prior investigations conducted by local law enforcement. The following is a summary of the evidence introduced at trial as part of the government's case-in-chief.

James Kelly ("Kelly"), an indicted co-conspirator and member of the Elk Block gang, testified at trial regarding the history of the Elk Block gang. Beginning in the early 1990s, a group of cocaine dealers operated in a neighborhood in the city of Syracuse that included South Salina Street, Elk Street, and McKinley Avenue (the "neighborhood"). They called themselves the "Ave. Boys," after McKinley Avenue. The Ave. Boys included co-defendants James Kelly ("Kelly") and Billy J. Applins ("Applins" or "Billy Applins") and appellant Dennis Jones ("Jones"), who sold crack-cocaine with Kelly and Applins.

Also in the early 1990s, a group of eleven- and twelve-year-old boys, including Ronnie Parnell, Ismail Pierce, Gregory Thomas, Jerrawn Thomas, and William Robinson, "hung out" in the neighborhood described above. They called themselves "Juveniles Wilding." Juveniles Wilding was considered to be "below" the Ave. Boys in gang status. Juveniles Wilding members engaged in "mischief," such as fistfights and stealing bikes, but members of Juveniles Wilding did not sell drugs

at first. In 1997 or 1998, however, the Ave. Boys merged with Juveniles Wilding, and the two groups began calling themselves Elk Block. Those who had been members of Juveniles Wilding then joined the others in selling crack-cocaine as part of their membership in the newly formed Elk Block. Elk Block members were in the business of selling crack-cocaine to users, either in the street or in crack houses in Elk Block territory.

Notwithstanding Elk Block's presence, there were other street gangs in the surrounding area. Each gang claimed an exclusive territory for drug dealing. To become a member in Elk Block, an individual had to be a current or former resident of the neighborhood or have relatives who lived there. As Kelly testified, "[y]ou got to live around [Elk Block territory] all your life or you got to be . . . a family member of somebody that's in the gang." Even if an Elk Block member had moved away from the neighborhood, he could go back to that neighborhood to sell crack-cocaine. Co-defendant Nathan Speights testified that although he lived outside the neighborhood in 2002, he continued to deal drugs in Elk Block territory because "that's the area I'm from . . . that's where I'm safe selling my drugs. That's where I know I'm going to make my money and nothing going to happen."

All of the appellants were known to each other by their nicknames, listed in a roster labeled "Elk Block Finest 2000" found during the execution of a police-led search of Pierce's apartment. For example, Jones was called Denny Man, Crazy D, or JJ; Pierce was Styles, Holiday, or Bird; Jerrawn Thomas was Piper or Jerod; Gregory Thomas was Earl or E-Z; and Robinson was Googs or Gugo.

Elk Block members also had a meeting place at the end of McKinley Avenue, which was a dead end at the top of a hill providing them with a view of anyone who might approach. Elk Block members met there to discuss, among other things, gang-related matters such as fights or "beefs" with rival gangs and how to retaliate against members of other gangs.

Elk Block members used various means to identify their territory and fellow members. For example, Elk Block members, including all of the appellants, used a hand sign forming an "E" to

represent gang identity. Gang graffiti was painted on various buildings to identify their territory. For a brief period in the late 1990s, some Elk Block members adopted a cream-colored bandana as a way to identify themselves as members of the gang. Several members got tattoos identifying themselves with Elk Block. For example, Dennis Jones had a tattoo on his arm that stated "Elk Block Finest."

As to the sale of illegal drugs, the senior members of Elk Block routinely pooled their money and bought drugs to supply the other gang members, who in turn sold to users. For a long time, Elk Block members Billy Applins, James Kelly, and Israel Applins[3] were the gang's primary crack-cocaine suppliers. Applins had a contact in the New York City area from whom he could purchase drugs. Applins, Kelly, and/or Israel Applins made at least forty trips to New York City to buy kilogram quantities of cocaine using money that the three had pooled together. They made weekly or bi-weekly trips and paid approximately $22,000–$25,000 per kilogram. In New York City, they typically wrapped the cocaine with coffee grounds to conceal its smell and placed the drugs within hidden compartments in their vehicles for transportation to Syracuse, New York. Applins also purchased kilogram quantities of cocaine from a local supplier, until that supplier's arrest in June 2000. Applins often cooked the powder cocaine into crack-cocaine and sold it to gang members. Applins also provided bulk quantities of crack-cocaine to Kelly and Israel Applins, who sold it in smaller quantities to other gang members.

Some of the younger gang members "graduated" and began dealing crack-cocaine in wholesale quantities. As part of their Elk Block membership, all of the appellants then sold crack-cocaine in Elk Block territory on a daily basis. They typically sold in small quantities. Sometimes they put $5, $10, or $20 pieces of crack in bags to sell; other times they sold "freestyle" — meaning they would carry a rock of crack around and break off a piece based on how much the crack-purchaser wanted. There were typically a number of gang members "out there and everybody want

---

[3] Israel Applins was not charged in the underlying case. According to the government, he is serving a federal sentence for gun trafficking.

to get their crack off, they would rotate the sale. If some person got more than others, they might get more sales at that time than others. We kind of like just worked it out among ourselves." When the younger members sold crack, they kept a portion of the proceeds and used the balance to buy more crack from senior members or others. Drugs were often fronted (i.e., tendered without immediate payment), and sometimes the sellers pooled their money so they could buy a supply of crack-cocaine at a lower cost.

Elk Block members controlled the drug sales in their territory. They did not sell in rival gangs' territories, and members of rival gangs ordinarily did not try to sell in Elk Block's territory. As cooperating witness Nathan Speights testified: "[A]in't nobody going to sell drugs in our territory and we ain't going to sell drugs in their territory."

If non-Elk Block members tried to sell drugs in Elk Block territory, they would be met with violence. Gang members did not even enter the territories of rival gangs — much less sell drugs there — without trouble. When Elk Block was at war with a rival gang called Boot Camp, Speights explained that Boot Camp members "couldn't even ride down Salina [Street in a car] without having a problem." There was one occasion in the year 2000 when members of the north side Bloods gang tried selling out of a "crack house" in Elk Block territory. Elk Block gang member Jerome Thomas (the brother of appellant Jerrawn Thomas) discovered the rival crack house and went to that house to confront the Bloods members selling drugs there. An altercation followed, during which one of the members of the Bloods attempted to stab Jerome Thomas. A couple of hours later, Elk Block gang members Nathan Speights and Gregory Thomas saw gang members of the Bloods driving in a car in Elk Block territory. Speights and Thomas ran through a "shortcut" to get closer to the car, and when the car stopped at a stop sign, they began shooting at the Bloods members in the car. Recalling the incident, Speights testified that "[i]t was a beef with people that was selling drugs in our neighborhood that ain't have no business out there."

In 2003, Kelly lost $53,000 when he was arrested in New York City prior to a drug buy. After that, Jones, Pierce, Jerrawn Thomas, and Robinson "graduated" and started buying their drugs

elsewhere, omitting Kelly as a middleman. Gregory Thomas, however, remained "just the same person, selling little drugs here and there." Even the gang members who dealt in higher weights continued to make street sales in Elk Block territory.

Evidence at trial also established that Elk Block members routinely carried firearms in order to protect their territory and drug trade and to retaliate against rival gangs. All of the appellants carried guns. Dennis Jones carried a .357 chrome revolver "almost all the time." William Robinson usually carried a black .40-caliber Glock automatic pistol. At the end of 1999 or beginning of 2000, because Elk Block had started "beefing" with Boot Camp, Ronnie Parnell gave Jerrawn Thomas $300 so that Thomas could buy a gun. Thomas bought a .357 automatic.

Elk Block members also had access to "gang guns." These guns were hidden in specific locations in Elk Block territory, such as abandoned houses, where they could be readily accessed. When a gang member was arrested on a drug charge, he was sometimes able to get the charge dismissed by surrendering one of the gang's guns to the police.

III.     Violent Conflicts

Evidence at trial included detailed descriptions of Elk Block's disputes and skirmishes with rival gangs. Applins testified that Elk block was on "relatively good terms" with the nearby Boot Camp gang until 1999. The period of urban tranquility ended when two Boot Camp members — Jeffrey Connors and Tron Wallace — robbed Applins of ten ounces of crack-cocaine. That robbery occurred sometime in late 1999, when Applins arranged to sell Boot Camp members Connors and Wallace ten ounces of crack-cocaine. They were to meet at a spot in Elk Block territory. Wallace arrived by car, and Applins — also in a car — drove up behind Wallace on Dougall Street. Applins got out of his car, approached Wallace, who was in his own car, and tendered to Wallace the crack-cocaine. When Applins walked around to the passenger side of Wallace's car to enter that car, Wallace drove off without paying for the crack-cocaine. Applins then entered his own car and chased down Wallace for about a block. Wallace then stopped his car, the trunk "popped" open, and "Connors came out with a large caliber weapon and started shooting at [Applins]." Applins

-11-

then backed up his vehicle and drove away to the intersection of State and Colvin, where he exited and left his vehicle. Applins thereafter armed himself but was unsuccessful in tracking down Connors and Wallace. Likewise, his attempt to hire someone to "shoot [Connors] up" was unsuccessful. After the robbery and shooting, Elk Block was at "war" with Boot Camp. Two other gangs — Freestyle and Brick Town — joined the war as allies of Boot Camp.

On April 14, 2000, Elk Block members including Darrel Harlow and Tory Jackson saw two Brick Town members — "Prince" (Joseph Bryant) and Divon Hunter — in their territory. Prince was arguing with his girlfriend, who was Darrel Harlow's cousin. Darrel Harlow stated to Prince: "[T]his is my cousin (referring to Prince's girlfriend), and you ain't even from out here . . . ." Harlow and other Elk Block members then beat up Prince and Hunter. Prince, it turned out, was related to Connors. Afterwards, Elk Block members, including Kelly, Speights, Jerrawn Thomas, and Israel Applins, were standing and talking at the corner of McKinley Avenue and State Street when Jeffrey Connors of Boot Camp drove up to them, exited the vehicle with a firearm, and asked them what had happened to Prince and who was responsible for the assault on Prince. The Elk Block members "back[ed] up" because Connors had a gun in his hand. Before anything happened, however, one of the Boot Camp members who was also there, Walliek Betts, told Connors that he had to "go chill" because Betts' mother was in the area. Connors got back in the car and left. When Connors left, Jerrawn Thomas ran around the corner to get a gun. At that point, the Elk Block members who had been confronted by Connors walked down the street to a house on the 2300 block of South Salina Street "where all the other Elk Block gang members" were located. Once there, Thomas and Israel Applins asked the other Elk Block members what had happened, and Elk Block members Tory Jackson and Darell Harlow informed them that they had "just jumped" Prince.

Soon thereafter, Connors drove up to the house on the 2300 block of South Salina Street where the Elk Block members were talking, got out of his car, and with his gun held at his side demanded to know who had assaulted Prince. Jerrawn Thomas then shot Connors from the top porch of the house, hitting Connors in the chest. Screaming, Connors fell to the ground, firing off

shots into the air. Jerrawn Thomas jumped off the porch, ran over to Connors, and shot him again as he lay on the ground. Connors was rushed to the hospital where he died a short time later.

After Jerrawn Thomas shot Connors, he and the other Elk Block members fled the neighborhood so that they would not be there when the police came to investigate the shooting. After some discussion among them it was decided that Thomas could claim self-defense because Connors had a gun. After staying at various hotels, Thomas turned himself in. Investigators were unable to develop any evidence to disprove Jerrawn Thomas's claim of self-defense. Ultimately, Thomas pleaded guilty to a gun-possession charge and was sentenced to a term of imprisonment.

On February 20, 2000, Elk Block members, including Kelly, Israel Applins, and Jones, were at Gersey's Bar. Also at the bar were Boot Camp members, including Tron Wallace. The Elk Block members realized that there were Boot Camp members waiting for them outside. Dennis Jones and three of the other Elk Block members were carrying guns. When the Elk Block and Boot Camp members left the bar, people "started shooting, everybody started running . . . ." Tron Wallace was shot in the foot. Jones was charged with shooting Wallace, which he denied. Billy Applins bailed him out, using drug proceeds. On June 27, 2000, Boot Camp gang members Karo Brown and Charles Myles, in a drive-by shooting in Elk Block territory, hit Robinson in the chest, causing serious injury.

On July 30, 2000, several Elk Block members were together on McKinley Avenue when Speights suggested going to Sabatino's Restaurant, because Boot Camp members might be there. The other members agreed, and they left in several cars for the restaurant "kind of looking for trouble." Those who went included Speights, Kelly, Jones, and Parnell. Jones drove there with Kelly. Once at the restaurant, several gang members, including Kelly, went in while others waited outside. Kelly left his gun with Jones, who waited outside. After a while, some Boot Camp members, including one named Delmar Everson, began approaching the restaurant entrance from the back parking lot. Israel Applins started shooting at them, and they ran behind the building and got back into their car, which was being driven by a female associate. Jones and Kelly entered their

car and gave chase. Many shots were fired. When Kelly exited the restaurant, Jones handed Kelly his gun, and Kelly rolled down the window and shot at the car occupied by Everson and other Boot Camp members. His bullets did not hit anyone, but as Everson and the others tried to flee, Everson crashed into a coffee shop across the street.

Following the exchange outside Sabatino's Restaurant, Elk Block gang members congregated at the top of McKinley Avenue to discuss the events of the evening. Jones and Kelly thought they had hit Everson and talked about getting rid of the gun. When police reported to the scene, they found ten 9mm casings and a slug on the driver's seat of the car in which Everson had been riding. The driver's side window was blown out. The female associate who drove the car filed a complaint with the police. The next day, Jones, Israel Applins, and another gang member — Fred Wright — were arrested for reckless endangerment. The charges were dropped however; Israel Applins "paid [the driver] off to get the charges dismissed."

Another shooting occurred in August 2000 when Gregory Thomas was selling drugs in Elk Block territory in the early morning hours. Thomas was shot in the foot by a member of the rival gang Freestyle in a drive-by shooting.

On August 24, 2000, Speights, Pierce, and Robinson were sitting in a parked car on Elk Street when Freestyle member "Noody" drove up and shot at them. Noody's car was so close that Speights could not get out of the driver's side door. Speights was hit six times — three times in the chest and three times in the leg — while he was trying to get out of the passenger side. Some time after Speights got out of the hospital, he, Israel Applins, and Pierce went to a house in Boot Camp territory looking for Charles Myles (who had been the driver in the June 2000 shooting of Robinson), and any other Boot Camp members. When they saw Myles in his car, they shot at him, hitting him in the arm.

On January 15, 2003, Robinson and Jerrawn Thomas — who recently had been released from prison on his sentence for weapon possession — had a van that they had "rented" from a crack-purchaser, and Speights was driving around with them. Jerrawn Thomas and Robinson were

both carrying handguns. They spotted two Brick Town members in a car — "slippin" in Elk Block territory — and followed them. Speights drove around the block and used the van to cut the Brick Town car off at the corner of Montgomery Street and Burt Avenue. Robinson slid open the van door (which was facing the Brick Town car) and started shooting, ejecting shell casings into the street. Jerrawn Thomas was sitting on the other side of the van, so he could not shoot without hitting Robinson. When the Brick Town car turned to get around the van, Thomas shot the glass out of the van window and reached out and then shot at the Brick Town car as it drove past them. During this incident, Boot Camp member Divon Hunter was shot in the hand.

On April 13, 2003, there was a major confrontation shortly after Jerrawn Thomas's release from prison. Members of Boot Camp and its allies, Freestyle and Brick Town, were due to attend a birthday party at the Komfort Zone Bar on South Salina Street. According to the testimony of Nathan Speights, Thomas wanted to go to the party "to be seen." Thomas's attendance at the Komfort Zone Bar was the "first time" he had been seen "out," which signified that he was "back on the scene" after his release from jail. Thomas also wanted to avenge the death of Elk Block member Fred Wright, who had been shot and killed by a Brick Town member while Thomas was in jail. When Thomas arrived inside the bar, someone threw a drink in his face and a fistfight erupted involving Elk Block and Boot Camp members and members of Boot Camp's allied gangs. The fistfight lasted some time, and resulted in injuries to several Elk Block members. Ismail Pierce was assaulted by Boot Camp member Cheiron Thomas. Jerrawn Thomas's younger brother, Jerome Thomas, was stabbed three times by Boot Camp member Corey Edwards. Elk Block members Pierce and Andre Applins left the bar together. According to Andre Applins, they were "seeking some type of retaliation towards a Boot Camp member, plannin[g], we talking about where we gonna go, where we gonna drive to." When they got to State and Burt Streets — a Brick Town gang area — Pierce spotted Boot Camp member Rodney Hill. Pierce grabbed a .38 from Applins, hopped out of the car, and ran towards Hill, firing several shots in the direction of Hill.

After the Komfort Zone fight, Kelly, Billy Applins, Speights, Robinson, Jones, Pierce, and several other Elk Block members congregated at their meeting place at the top of McKinley Avenue to discuss what had happened and to make plans. Everyone was angry with Jones because he had not joined in the fighting at the bar. Pierce wanted to go to "the Bricks" (Brick Town gang's territory) and do a shooting. Pierce was "looking for no one person, anybody from the Bricks or Boot Camp that's down there, that's who he was going to look for." Shortly thereafter, Jerrawn Thomas, Speights, and Robinson got in a car and headed for a neighborhood called Pioneer Homes, where a Boot Camp member's girlfriend and child were living. Robinson was carrying his .40 caliber Glock pistol. Thomas was also carrying a gun. Speights was driving. The three men spotted Boot Camp members congregating on a road called Frisbie Court. Speights stopped the car and Thomas and Robinson jumped out. They emptied their weapons into the crowd, jumped back into the car, and drove off. Apparently, no one was injured at the Frisbie Court shooting. The next day, Elk Block members congregated at Robinson's house to talk about what else they were going to do. They decided to retaliate against Boot Camp with violence: "anywhere we see anybody from Boot Camp, Brick Town, anybody, we just gonna give it to them . . . ."

Two weeks later, on April 27, 2003, Jerrawn Thomas and Robinson were driving around near the home of Boot Camp gang member Delmar Everson. They spotted Everson walking near a paint store next to Everson's house. Thomas pulled into the paint store parking lot. Robinson got out and shot Everson several times, hitting him in his neck, arm, and back, and killing him.

On June 27, 2003, Elk Block member Demetrius Elmore was shot and killed in Boot Camp territory by members of the Boot Camp gang. After Elmore was shot, Billy Applins arranged to sell Jones a gun and a bullet proof vest. He also gave a gun to Gregory Thomas, which was available to all the Elk Block members "working" with Gregory Thomas on the "late night shift" (midnight to the morning). The government's case-in-chief was not limited to the foregoing violent acts of Elk Block, as the evidence included other gang-related shootings by and of Elk Block members.

**ANALYSIS**

I. <u>Whether a Conviction for RICO Conspiracy Requires Proof of an "Enterprise"</u>

The defendants argue that a conviction for RICO conspiracy under 18 U.S.C. § 1962(d) cannot be upheld where the government has failed to prove the existence of an actual enterprise. The defendants claim that proof of an enterprise is an essential element of the offense of RICO conspiracy. At trial, the defendants preserved this argument by requesting that the district court instruct the jury that it had to find the existence of an enterprise. In accordance with that request, the court gave the following charge:

> In order to convict a defendant on the RICO conspiracy offense charged in Count 1, the Government must prove all of the following four elements beyond a reasonable doubt:
>
>> First, that an enterprise would be established as alleged in the indictment.
>
>> Second, that the enterprise would be engaged in or its activities would affect interstate or foreign commerce.
>
>> Third, that the defendant would be employed by or associated with the enterprise.
>
>> And fourth, that the defendant knowingly agreed to conduct or participate directly or indirectly in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity.

Shortly thereafter, the court gave the following instruction:

> To convict each defendant on the RICO conspiracy offense charged in Count I, <u>the Government is not required to prove that the alleged enterprise was actually established</u>, that the defendant was actually employed by or associated with the enterprise, or that the enterprise actually engaged in or its activities actually affected interstate or foreign commerce. Rather, because the agreement to commit a RICO offense is the essence of a RICO conspiracy offense, the Government need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be established, that the defendant would be employed by or associated with the enterprise, and that the enterprise would be engaged in or its activities would affect interstate or foreign commerce.
>
> Now first, to prove the RICO conspiracy violation charged in Count 1, <u>the Government must prove beyond a reasonable doubt the existence of an enterprise</u>. The enterprise alleged in the indictment is the Elk Block gang.

(emphasis supplied). After instructing the jury as to the nature and definition of an "enterprise" for purposes of RICO, the court further instructed that "[t]he government is not required to prove each

-17-

and every allegation about the enterprise or the manner in which the enterprise operated." Appellants challenge so much of the instruction as would allow the jury to convict without a finding that an enterprise existed.

"We review challenged jury instructions de novo but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." United States v. Bok, 156 F.3d 157, 160 (2d Cir. 1998). "[T]he defendant 'bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced.'" United States v. Nektalov, 461 F.3d 309, 313–14 (2d Cir. 2006) (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)). A "jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Bok, 156 F.3d at 160. The jury instruction here, although inconsistent, properly allowed for conviction upon proof of an agreement to form an enterprise.

The RICO conspiracy statute under which the defendants were convicted, 18 U.S.C. § 1962(d), provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Section 1962(c) sets forth a substantive RICO offense and provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

In turn, RICO defines "enterprise" as "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." Id. at 580, 583. We have held that "the existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.'" United States v. Coonan, 938 F.2d

1553, 1559 (2d Cir. 1991) (quoting United States v. Bagaric, 706 F.2d 42, 56 (2d Cir. 1983)). For this reason, we have stated that "proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." Id. at 1560; see United States v. Boyle, 129 S. Ct. 2237, 2245–47 (2009) (proof of the enterprise and the pattern of racketeering acts may "coalesce" and be derived from same sources); id. at 2245 (existence of enterprise may be inferred from the pattern of racketeering acts); United States v. Ferguson, 758 F.2d 843, 853 (2d Cir. 1985) ("RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced." (citations, internal punctuation, and internal quotation marks omitted)).

As to an "association-in-fact enterprise," the Supreme Court has held that "an association-in-fact enterprise must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." Boyle, 129 S. Ct. at 2244 (internal quotation marks omitted). However, an association-in-fact enterprise under RICO need not have a hierarchical structure, a chain of command, or other business-like attributes. See id. at 2245. "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 2244.

Although we have not expressly held that the existence of a RICO enterprise is not a necessary element to be proven for a conviction of RICO conspiracy, the Supreme Court in Salinas v. United States, 522 U.S. 52 (1997), provided some guidance as to what is necessary for a RICO conspiracy conviction under § 1962(d). In Salinas, the defendant, who was convicted of one count of RICO conspiracy but acquitted of one count of violating substantive RICO, 18 U.S.C. § 1962(c), argued that his conviction for conspiracy to violate RICO could not stand because the jury was not instructed, and the government had not proven, that "he himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c)." 522 U.S. at 61. Recognizing a circuit split as to whether a RICO conspiracy conviction requires proof that a

-19-

defendant committed or agreed to commit two or more predicate acts, the Court held that "[t]here is no requirement of some overt act or specific act in [18 U.S.C.] § 1962(d), unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an act to effect the object of the conspiracy. [18 U.S.C. § 371]. The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in [18 U.S.C.] § 371." Salinas, 522 U.S. at 63 (internal quotation marks omitted). The Court noted that the "relevant statutory phrase in § 1962(d) is 'to conspire'" and that it "presume[d] Congress intended to use the term in its conventional sense." Id. Accordingly, the Court rejected defendant Salinas's argument that the government must prove that he had committed two predicate acts. See Salinas, 522 U.S. at 64 ("The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts."); see also United States v. Yannotti, 541 F.3d 112, 121–22 (2d Cir. 2008) (discussing Salinas, 522 U.S. at 63–64).

The Supreme Court also rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed:

> It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.
>
> It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections [§ 1962] (c) and [§ 1962] (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense. True, though an "enterprise" under § 1962(c) can exist with only one actor to conduct it, in most instances it will be conducted by more than one person or entity; and this in turn may make it somewhat difficult to determine just where the enterprise ends and the conspiracy begins . . . . In some cases the connection the defendant had to the alleged enterprise or to the conspiracy to further it may be tenuous enough so that his own commission of two predicate acts may become an important part of the Government's case.

Salinas, 522 U.S. at 65–66; accord United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) ("Just as the evidence used to establish the enterprise and pattern elements may in particular cases coalesce,

so too may the evidence used to prove those elements and a conspiratorial agreement to engage in racketeering." (internal quotation marks omitted) (citing United States v. Martino, 648 F.2d 367, 382–83 (5th Cir. 1981) ("Prosecution of RICO substantive and conspiracy charges expectedly involves considerable overlap in the evidence."))). We have held that for purposes of establishing a RICO conspiracy, "the government [is] required to prove only the existence of an agreement to violate RICO's substantive provisions. Thus, the government necessarily ha[s] to establish that [the defendant] agreed with his criminal associates to form the RICO enterprise . . . ." United States v. Benevento, 836 F.2d 60, 73 (2d Cir. 1987) (emphasis supplied), abrogated on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989); cf. id.("The significant distinctions between the proof required to establish the RICO conspiracy and the underlying substantive RICO offense belie [defendant's] claim that convictions under both the substantive and conspiracy counts [of RICO] violate the double jeopardy clause." (citing Pinkerton v. United States, 328 U.S. 640, 643–44 (1946) (same))).

In United States v. Zichettello, 208 F.3d 72 (2d Cir. 2000), we further explained that to be convicted as a conspirator under RICO, "one must be shown to have possessed knowledge of only the general contours of the conspiracy." 208 F.3d at 100; see Yannotti, 541 F.3d at 122 (stating that under Salinas "to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme"); see also Zichettello, 208 F.3d at 98–99 (stating that "under the Supreme Court's decision in Reves v. Ernst & Young, 507 U.S. 170 (1993), the [Supreme] Court ruled only that for a defendant to be convicted of a substantive RICO violation under section 1962(c), the defendant must have taken some part in directing the enterprise's affairs. No such requirement exists under Section 1962(d), however." (citing Salinas, 522 U.S. at 63–64)); Baisch v. Gallina, 346 F.3d 366, 376–77 (2d Cir. 2003) (quoting Salinas, 522 U.S. at 65); United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (stating that a "conspirator charged with racketeering conspiracy need not commit . . . the predicate acts . . . to be found guilty of the racketeering conspiracy, for it suffices that he adopt[] the goal of furthering or facilitating the

criminal endeavor" (internal quotation marks omitted)); United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989) (stating that a defendant may agree to join a RICO conspiracy without knowing the identities of "all the other conspirators" and without "full knowledge of all the details of the conspiracy"). We accordingly conclude that Salinas counsels that the establishment of an enterprise is not an element of the RICO conspiracy offense.[4]

In this case, we agree with the appellants that the district court's instructions were conflicting and, in part, erroneous. Appellants requested the erroneous instruction that the government was required to prove the existence of an enterprise. The court gave the instruction as requested. Although one of the appellants' attorneys (Pierce) mentioned potential jury confusion, there was never any suggestion as to how the inconsistency might be resolved. Further, the court gave defense counsel its charge in writing before reading it to the jury, and no such suggestion to resolve the inconsistency was made. Indeed, the appellants had an obvious interest in retaining the erroneous portion of the instruction even if it was inconsistent with the correct portion, since the erroneous instruction elevated the government's burden beyond what was required by law and what was set forth in the indictment. See, e.g., United States v. Naiman, 211 F.3d 40, 51 (2d Cir. 2000) (stating that even with respect to preserved error, reversal is required on the basis of error in jury instructions only if the instructions, viewed as a whole, caused the defendant prejudice).

---

[4] To the extent that the defendants argue that there is dicta in previous cases of ours suggesting that a RICO conspiracy conviction requires proof of an enterprise, see, e.g., United States v. Reifler, 446 F.3d 65, 68 (2d Cir. 2006) (stating that an "essential element[]" of a RICO conspiracy charge included the "existence of a RICO 'enterprise.'"); United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) ("Assuming that a RICO enterprise exists, the government must only prove 'that the defendant[s] . . . know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s]." (emphasis supplied; omissions and brackets in original)), we reject this argument because in those cases, the government relied on evidence of the actual existence of an enterprise and pattern of racketeering acts to prove the conspiracy, see Reifler, 446 F.3d at 99 (concluding that "the evidence against [the defendants] was sufficient to all three alleged racketeering acts, and [therefore defendants'] challenges to their convictions on the Count One charge of RICO conspiracy are meritless").

Nevertheless, we are not persuaded that the defendants were prejudiced by the court's conflicting instructions.[5]

II.    Sufficiency of the Evidence Challenges

The appellants also contend that there was insufficient evidence to support a finding of an agreement to form an enterprise. As to sufficiency-of-the-evidence challenges, we must credit every inference that could have been drawn in the government's favor, and we must view the evidence as a whole. See, e.g., United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003); United States v. Podlog, 35 F.3d 699, 705 (2d Cir. 1994). Accordingly, "[i]n challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden." Hamilton, 334 F.3d at 179. This Court "defer[s] to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). If the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999). "In cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006) (citation and internal quotation marks omitted). As to RICO conspiracy, the Supreme Court has held that

> [a] conspirator must intend to further an endeavor which, if completed, would satisfy
> all of the elements of a substantive criminal offense, but it suffices that he adopt the
> goal of furthering or facilitating the criminal endeavor. He may do so in any number

---

[5] Even if proof of the existence of an enterprise were required, we conclude that the trial evidence and record before us demonstrates that the evidence was more than sufficient to permit a jury finding that an "enterprise" was proven beyond a reasonable doubt in this case. See United States v. Jackson, 196 F.3d 383, 386 (2d Cir. 1999) (stating that we will sustain a conviction if we find that the jury would have returned the same verdict beyond a reasonable doubt).

-23-

of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

Salinas, 522 U.S. at 65; see also id. ("A person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense."); United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994) ("A defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly."); accord Goren v. New Vision Int'l, Inc., 156 F.3d 721, 731 (7th Cir. 1998) ("[W]e have held that a defendant can be charged under § 1962(d) even if he cannot be characterized as an operator or manager of a RICO enterprise . . . ."). The relevant inquiry is whether the defendant "agreed with his criminal associates to form the RICO enterprise." Benevento, 836 F.2d at 73. We have stated that a RICO conspiracy requires proof "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering" and that "the conduct prong requires only that conspirators reached a meeting of the minds as to the operating of the affairs of the enterprise through a pattern of racketeering conduct." United States v. Basciano, 599 F.3d 184, 199 (2d Cir. 2010); Zichettello, 208 F.3d at 99 ("A RICO conspiracy charge is proven if the defendant embraced the objective of the alleged conspiracy, and agreed to commit . . . predicate acts in furtherance thereof." (internal quotation marks omitted)). Further, to be convicted as a conspirator, the government does not have "to prove that a conspirator knew of all [of the] criminal acts by insiders in furtherance of the conspiracy"; rather, "one must be shown to have possessed knowledge of only the general contours of the conspiracy." Zichettello, 208 F.3d at 100.

Here, we have little difficulty concluding that the government proved beyond a reasonable doubt that the defendants agreed that an enterprise would be established (and also that one was actually established) and that the appellants were aware of the general nature of the conspiracy. The evidence demonstrated, for example, that Elk Block gang members congregated daily in their territory, marked their territory with graffiti, received tattoos signifying their membership in the gang, and flashed the Elk Block hand sign in public places to "represent" that they were members of

-24-

Elk Block. Elk Block members also had a common function and purpose: "just basically sell drugs, protect our territory, and protect each other, that's it." The evidence also demonstrated that Elk Block served a particular territory and drug market and that as to this "territory" and Elk Block's drug dealing in that territory, the evidence clearly established that individual Elk Block members agreed to provide, and did provide, protection (i.e., firearms and violence) for their fellow gang members.

Appellants contend that there was insufficient proof of an enterprise because: the gang members who supplied the street sellers in Elk Block could supply other people as well; the street sellers could sell outside Elk Block territory should they choose to do so; and the gang members could buy from whomever they wished. However, the evidence was clear that drug sales in Elk Block territory could be made only by Elk Block members or, on rare occasions, with their permission. Although Applins testified that he sold crack-cocaine to Elk Block street-level dealers who kept their own profits, there was overwhelming evidence that the dealers paid part of their profits to Applins and the other senior members so that the latter could purchase more drug supply in New York City. Indeed, there was sufficient evidence presented at trial to permit the jury to conclude that senior Elk Block members repeatedly pooled the gang members' proceeds to buy crack in wholesale quantities, clearly indicating the existence of an enterprise and common purpose.

To the extent that the appellants argue that no Elk Block member gave or obeyed orders, and, thus, no agreement or structured enterprise existed, we reject these contentions because the government is not required to prove that Elk Block had an hierarchy or a decision-making framework. See Boyle, 129 S. Ct. at 2245 (holding that an enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods — by majority vote, consensus, a show of strength, etc"). It was not necessary for the government to establish that Elk Block members took or gave orders. Their activities were coordinated to serve common goals, and that is all that is required. See id. ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose . . . ."). In any event,

-25-

the evidence at trial indicates that there was some form of hierarchy. Elk Block gang members became "senior members" through longevity and by "graduating" from street sales to "selling weight." For example, Billy Applins and Israel Applins — the main suppliers of crack-cocaine to Elk Block gang members — were senior members, and Kelly was a low-level drug dealer who purchased his drugs from them. In 1998, Kelly went to Billy Applins with $5,000 that Kelly had saved from his drug sales so that he could move up. Billy Applins "pulled [him] in," and thus Kelly graduated to senior-member status. From that point on, Kelly obtained drugs with or from Billy Applins and sold to other Elk Block gang members, including the appellants. He joined Billy Applins and Israel Applins in their trips to New York City to buy cocaine using money they had pooled. As Kelly explained, he did not consider himself a "leader" and did not give orders. He explained that senior-member status meant that a member was older, financially wise, had sold a lot of drugs, and was one to whom other Elk Block members could come for any type of help, including financial assistance.

Further evidence of the defendants' agreement to form an enterprise and participate in its affairs included instances where Kelly, Israel Applins, and Billy Applins provided other assistance to gang members when necessary. Such assistance included paying bail (from proceeds of Elk Block drug sales) and attorney's fees when a member was criminally charged, and "fronting" drugs to members so they could get back on their feet after serving a jail sentence. While Billy Applins was in jail on drug charges, Kelly "took over [Applins's] position, was making sure everything was running smooth at the time." After Applins got out of jail, he was on probation and began selling his drugs "primarily through James Kelly." When violence between Elk Block and rival gang Boot Camp broke out after Applins was the victim of a drug robbery, Applins saw that Elk Block needed "fire power" because Boot Camp had more guns than Elk Block did. He then conspired with senior Elk Block member Darell Harlow to purchase guns in Georgia. Applins used proceeds from Elk Block's narcotics business to buy the guns. When the guns arrived, Billy Applins gave them to Israel

Applins to distribute to certain Elk Block gang members. He also gave Gregory Thomas a gun so that Thomas and other gang members could protect themselves.

With respect to Jones, evidence at trial also included a two-by-three-foot framed photograph of Jones with each hand making the Elk Block sign. This photograph was hanging in the livingroom in an apartment that had "Jones" on the mailbox and contained, in a drawer in the main bedroom, a composition book that said "ELK BK Dennis Jones Dennyman" on the cover, and another notebook that said "ELK BK" and "AVE Boys" and had Jones's resume in it. The evidence also included the fact that in around 1999, Jones got a tattoo that said "Elk Block Finest." Other gang members, however, had tattoos that said just "Elk Block"; according to Nathan Speights, Jones' tattoo indicated that "he basically feel [sic] like he got more respect than everybody else . . . ." Jones was also on the roster of Elk Block members found at Pierce's residence at 104 Elk Street. Evidence demonstrated that Jones started selling crack in Elk Block territory with Kelly back in 1994, when the gang was known as the Ave. Boys. Thereafter, he sold crack in Elk Block territory on a daily basis when he was not in jail. Billy Applins testified that although Jones did not live in the area at the time, he was able to sell there because "[h]e was part of the gang" and had a family connection. Kelly testified that before 2003, he sold crack to Jones "practically every day." Evidence at trial also demonstrated that after the violence with Boot Camp began to escalate, Jones often carried a firearm. For example, Jones drove the car from which Kelly shot at Bootcamp members in the July 30, 2000 Sabatino's shootout. On another occasion, Jones prowled Boot Camp territory with his gun out, looking for someone to shoot. Jones eventually became a "senior member." After the indictment was returned, Jones fled to Virginia with fellow gang members and co-defendants Ismail Pierce and Skyler Willis. Given the foregoing, we conclude that there was sufficient evidence that Jones agreed to participate in the conspiracy.

With regard to appellant Ismail Pierce, we conclude that the government presented sufficient evidence upon which the jury could rely to find that Pierce agreed to participate in the conspiracy. For example, Kelly testified that he sold crack to Pierce and that Pierce sold crack to customers on

the streets in Elk Block territory on a daily basis. There was also evidence that Pierce fired shots at Rodney Hill, a Boot Camp gang member, during an altercation between Elk Block and Boot Camp gang members at the Komfort Zone bar. Moreover, the government introduced rap lyrics Pierce wrote which revealed Pierce's knowledge of the Elk Block gang and the gang violence. See United States v. Jones, No. 05-CR-322 (NAM), 2007 WL 1428464 (N.D.N.Y. May 11, 2007) (summarizing trial evidence and rejecting defendants' sufficiency of the evidence challenges raised in post-trial motions).

As to Jerrawn Thomas, the evidence at trial demonstrated that he sold crack-cocaine in Elk Block territory on a regular basis and that Thomas shot and killed Jeffrey Connors, a Boot Camp gang member, in a gang related incident. The government also presented evidence that Thomas shot into a crowd at Frisbie Court in an attempt to retaliate against Boot Camp gang members following a gang altercation at the Komfort Zone Bar. Id.

With regard to William Robinson, the government also adduced sufficient evidence upon which the jury could find beyond a reasonable doubt that Robinson agreed to participate in the conspiracy. For example, co-conspirators testified that Robinson regularly sold crack cocaine in Elk Block territory and carried a gun. Evidence also demonstrated that Robinson attempted to retaliate against the Boot Camp gang following the altercation at Komfort Zone, by shooting numerous shots into a crowd gathered in Frisbee Court. There was also evidence that members of rival gangs shot Robinson on at least two occasions. Id.

Finally, there was evidence at trial that Gregory Thomas engaged in daily crack-cocaine sales in Elk Block territory and that Billy Applins "fronted" Thomas crack cocaine after Thomas was released from prison to help him get back on his feet. Indicted co-conspirator and Elk Block gang member Ronnie Parnell testified that in 2000, when violence started to escalate between Elk Block and other gangs in the area, each defendant, including Thomas, secured and carried a gun. Parnell further testified that in 2000, after Thomas was shot by a member of the Freestyle gang, he spoke to Parnell about retaliating and shooting someone from Freestyle. Accordingly, we conclude that there

was sufficient evidence upon which the jury could conclude that Gregory Thomas agreed to participate in the conspiracy.

We conclude from the record before us that there was more than sufficient evidence to permit the jury to find that each of the appellants agreed to form a RICO enterprise and to conduct, and participate in, the conduct of the gang's affairs.[6]

III.    Unanimity as to Which Predicate Acts the Defendants Agreed Would Be Committed

The appellants argue, as they did in the district court, that the district court erred in failing to instruct the jury that it was required to find unanimously which specific racketeering acts that the defendants agreed would be committed. The court did instruct the jury that it needed to find that each defendant agreed to the commission of at least two racketeering acts. The district court's instructions on this point were as follows:

> . . . [T]he agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense.
>
> You may find that a defendant has entered into the requisite agreement to violate RICO when the Government has proven beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that at least two racketeering acts would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. The Government is not required to prove that the defendant personally committed two racketeering acts or that he agreed to personally commit two racketeering acts. Rather, the Government must prove beyond a reasonable doubt that the defendant agree[d] to participate in the enterprise with the knowledge and intent that at least one member of the RICO conspiracy, which could be the defendant himself, would commit at least two predicate racketeering acts in the conduct of the affairs of the enterprise.
>
> In addition, the indictment need not specify the predicate acts that the defendant agreed would be committed by some member of the conspiracy in the conduct of the affairs of the enterprise. You may consider the evidence presented of racketeering acts committed or agreed to be committed by any co-conspirator in furtherance of the enterprise's affairs to determine whether the defendant agreed that at least one member of the conspiracy would commit two or more racketeering acts.
>
> Now, moreover, in order to convict the defendant of the RICO conspiracy offense, your verdict must be <u>unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed</u>; for example, at least

---

[6] Appellant Singletary does not challenge the sufficiency of the evidence as to his conviction for RICO conspiracy.

two acts of murder, attempted murder, or drug trafficking, or one of each, or any combination thereof.

(emphasis supplied). The appellants claim that the court erred in providing the foregoing instructions because these instructions only required that the jury unanimously agree as to which type of predicate acts the defendants agreed to commit and not the specific predicate acts themselves. The indictment in this case specified fifty-four "acts of racketeering activity in the conduct of the affairs of the enterprise" but did not specify predicate acts as an element of the charge of conspiracy. For purposes of proving a defendant's participation in a RICO conspiracy, unanimity is not required because the charge was conspiracy rather than a substantive RICO offense:

> [T]o list adequately the elements of section 1962(d), an indictment need only charge . . . that the defendant knowingly joined in a conspiracy the objective of which was to operate that enterprise through an identified pattern of racketeering activity . . . Neither overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proven for a section 1962(d) offense.

United States v. Glecier, 923 F.2d 496, 500 (7th Cir. 1991). In Glecier our sister circuit explained that:

> If the government were required to identify, in indictments charging violation only of section 1962(d), specific predicate acts in which the defendant was involved, then a 1962(d) charge would have all of the elements necessary for a substantive RICO charge. Section 1962(d) would thus become a nullity, as it would criminalize no conduct not already covered by sections 1962(a) through (c). Such a result, quite obviously, would violate the statutory scheme in which conspiracy to engage in the conduct described in sections 1962(a) through (c) is itself a separate crime. . . . [T]hat separate crime centers on the act of agreement, which makes unnecessary — and in many cases impossible — the identification in the indictment of specific predicate acts that have come to fruition.

Glecier, 923 F.2d at 501 (emphasis in original); United States v. Crockett, 979 F.2d 1204, 1209 (7th Cir. 1992) (quoting Glecier, 923 F.2d at 501)).

Because a RICO conspiracy charge need not specify the predicate or racketeering acts that the defendants agreed would be committed, Salinas, 522 U.S. at 64 ("The RICO conspiracy statute broadened conspiracy coverage by omitting the requirement of an overt act." (internal citation omitted)); Yannotti, 541 F.3d at 129 (stating that "to secure [defendant's] conviction for RICO conspiracy, the government was not required to prove the actual commission of a single predicate

act by [defendant] or any other conspirator" (emphasis in original)), it is sufficient to allege and prove that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity. See Glecier, 923 F.2d at 499–500; see also Crockett, 979 F.2d at 1209 n.3 (concluding that the indictment contained sufficient information to fall well within the boundary for RICO conspiracy where that indictment "alleged acts of violence carried out during a specific period of time for specific purposes in furtherance of the delineated activities of a RICO enterprise") (citing United States v. Phillips, 874 F.2d 123, 130 (3d Cir. 1989) (holding that where RICO conspiracy count generally identified racketeering acts as acts of bribery and extortion, government "can rely on any act of bribery and extortion, so long as that act occurred within the time frame of the conspiracy and was established by proof[] at the trial"); United States v. Sutherland, 656 F.2d 1181, 1197 (5th Cir. 1981) (rejecting similar lack of specificity challenge to RICO conspiracy indictment where indictment identified the pattern of racketeering activity as "a number of bribes that occurred between November 1975 and January 1980")); United States v. Elliott, 571 F.2d 880, 903 (5th Cir. 1978) (highlighting the importance of predicate racketeering acts because they can prove the agreement: "Where . . . the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable."); accord United States v. Hein, 395 F. App'x 652, 656 (11th Cir. 2010) (concluding that the district court properly instructed the jury that it "must find beyond a reasonable doubt that the defendant agreed that at least one member of the conspiracy would commit at least two acts of 'racketeering activity,' sometimes called predicate offenses, as described in the indictment, within ten years of each other" and that the jury "must also unanimously decide on what type of racketeering acts were involved in the conspiracy" (quoting Glecier, 923 F.2d at 500) (emphasis supplied)).[7] In agreement with the

[7] Cf. United States v. McAllister, 112 F. App'x 771, 773 (2d Cir. Oct. 25, 2004) ("Appellant contends that the court erred in failing to instruct the jury that it was required to find unanimously which specific predicate acts the defendant agreed would be committed in the course of the RICO conspiracy. Because this objection was not raised below, we review the jury charge for plain error.
(continued...)

foregoing cases, we conclude that the district court's instruction was sufficient in requiring unanimity as to the types of predicate racketeering acts that the defendants agreed to commit without requiring a finding of specific predicate acts.

Similarly, we also reject appellants' argument that their convictions must be reversed because the jury was not required to answer special interrogatories as to which specific predicate acts each defendant agreed would be committed. We have recognized a "preference for special interrogatories in particularly complex criminal cases." United States v. Ogando, 968 F.2d 146, 149 (2d Cir. 1992); see id. at 148–49 ("These complexities have prompted us to conclude that, notwithstanding the law's 'traditional distaste for special interrogatories,' 'where the offense charged required proof of a specific number of predicate facts and the nature of the proof at trial warrants it, the trial court would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases." (quoting United States v. Roman, 870 F.2d 65, 73 (2d Cir. 1989)); cf. United States v. Ruggiero, 726 F.2d 913, 926 (2d Cir. 1984) ("We take this opportunity to alert bench and bar that in a complex RICO trial such as this one, it can be extremely useful for a trial judge to request the jury to record their specific dispositions of the separate predicate acts charged, in addition to their verdict of guilt or innocence on the RICO charge."), abrogated on other grounds by Salinas, 522 U.S. at 64. Nevertheless, the use of special interrogatories is not required, as we

> have declined to delineate bright-line rules for determining when such interrogatories should be employed or in what form. Nor have we promulgated a checklist of criteria that district courts are bound to consider. Rather, we commit the decision of whether and how to utilize special interrogatories in such cases to the broad discretion of the district court.

Ogando, 968 F.2d at 149 (citing United States v. Aiello, 900 F.2d 528, 534 (2d Cir. 1990)); Ruggiero, 726 F.2d at 927–28 (Newman, J., concurring in relevant part and dissenting in part); Robert M.

---

[7](...continued)
In light of the unsettled state of the law on this issue, neither side having pointed us to any case holding that the trial court is or is not required to give such an instruction, the charge given to the jury was not plainly erroneous." (internal citations omitted)).

Grass, Note, Bifurcated Jury Deliberations in Criminal RICO Trials, 57 FORDHAM L. REV. 745, 754 (1989) (stating that the "ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge" and that "[n]either the prosecutor nor the defendant has the right to insist on their use")); accord United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) ("[W]e recognize that the district court's use of a general verdict for a multi-object conspiracy, though disfavored, does not violate the defendant's Sixth Amendment rights. Griffin v. United States, 502 U.S. 46, 47–48 (1991). Nor does the district court's refusal to require a special verdict provide an independent basis for reversing an otherwise valid conviction."); United States v. Console, 13 F.3d 641, 663 (3rd Cir. 1993) ("The district court has discretion in determining whether to submit special interrogatories to the jury regarding the elements of an offense.").

IV.     Whether Gregory Thomas should be resentenced in light of *Kimbrough*

The Untied States Sentencing Guidelines were amended, effective on November 1, 2007, to reduce by two levels the offense level applicable to crack-cocaine offenses. See U.S.S.G. Supp. to App. C, amend. 706 (2009); Amendments to the Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571–28573. The Sentencing Commission later designated the crack-cocaine amendment as one that may be applied retroactively, effective March 3, 2008. U.S.S.G. Supp. to App. C, amend. 713 (2009); U.S.S.G. § 1B1.10(c).

In this case, Gregory Thomas was convicted and sentenced for an offense involving crack-cocaine. The parties submitted their sentencing memoranda to the district court, and the district court sentenced Thomas, prior to the amendments and prior to the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85 (2007), in which the Court held that a sentencing judge may consider the disparity between the Guidelines's treatment of crack- and powder-cocaine offenses. 552 U.S. at 575.

The record demonstrates that Thomas has preserved his claim that the application of the Sentencing Guidelines's powder-crack disparity would result in a sentence greater than necessary to achieve the sentencing objectives in § 3553(a). In his April 23, 2007 sentencing memorandum

submitted to the district court, Thomas specifically argued, inter alia, that he was, for purposes of sentencing, subject to "high exposure . . . due to the scoring of over 1.5 kilograms of crack cocaine." Thomas claimed that "[t]his penalty is grossly disproportionate to the offenses" of which he had been convicted, and he noted that the Guideline ratio of 100 to 1 between crack and cocaine had been "the subject of criticism by courts, legal commentators and the Sentencing Commission on the grounds that the disparity lacks any persuasive penal or scientific justification, and it has a racially disparate impact in federal sentencing." Thomas further argued that the "legislative history . . . contains no rationale for the 100:1 ratio, and the Sentencing Commission has studied the issue in depth since and found no data to support Congress'[s] assumptions in passing the legislation." Thomas accordingly urged the district court to impose a non-Guidelines sentence or in the alternative to grant him a downward departure from the Guidelines.

At the May 23, 2007 sentencing hearing for Thomas, his counsel again raised the issue of the crack and powder cocaine disparity and noted the Sentencing Commission's then-ongoing review of the "crack versus powder differential." Specifically, counsel stated that the "new Commission Guidelines . . . will affect [Thomas's] calculations if the court adheres strictly to a Guidelines determination." In response, the district court stated: "Well, this, I know there's a lot of talk about the discrepancy between cocaine versus — cocaine powder versus crack, and at this point in time, though, the law has not changed. So you may have an exception there also." The district court went on to impose a term of imprisonment of 360 months, a term of supervised release of 5 years, and a special assessment of $100. For its part, the government's sentencing memorandum submitted in the district court cited to United States v. Castillo, 460 F.3d 337, 361 (2d Cir. 2006), for the general proposition that a district court may not deviate from a Guidelines sentence based upon a policy disagreement with the disparity between the Guidelines; however, the government did not discuss in its sentencing memorandum the disparate treatment of crack versus powder cocaine offenses.

Although Thomas did not move in the district court, pursuant to 18 U.S.C. § 3582(c)(2), for a sentencing reduction based upon the crack-cocaine amendment, at the time of Thomas's

sentencing, on May 23, 2007, the law of this Circuit "did not acknowledge a district court's so-called 'variance discretion' with respect to whether" the 100-to-1 crack-powder ratio "results in an unfair measure of the seriousness of the offense." United States v. Keller, 539 F.3d 97, 99 (2d Cir. 2008); see Castillo, 460 F.3d at 361 (holding that district court erred when it substituted its own crack-powder ratio for the ratio set forth in the Guidelines). Moreover, because the record does not "unambiguously demonstrate" that the district court was aware of its discretion to vary from the Guidelines if it found that the disparity in the crack-powder ratio resulted in a greater sentence than necessary, remand is appropriate. Keller, 539 F.3d at 101–02. Because the record also clearly demonstrates that Thomas preserved this issue by raising it in his sentencing memorandum and at the sentencing hearing, we remand to the district court for plenary resentencing consistent with Kimbrough. United States v. Jones, 531 F.3d 163, 180–83 (2d Cir. 2008); cf. United States v. Regalado, 518 F.3d 143 (2d Cir. 2008) (remanding, under plain error review, to the district court to allow the court to determine whether resentencing was required where the defendant failed to preserve an argument that the district court should have exercised its authority under 3553(a) to consider the disparity between the crack and powder-cocaine Guidelines).

We have considered all of appellants' remaining arguments and find them to be without merit.

## CONCLUSION

In accordance with the foregoing, we AFFIRM the judgments of the district court in all respects except for the sentence of Gregory Thomas. With regard to that sentence, we REMAND to the district court for plenary resentencing in light of Kimbrough v. United States, 552 U.S. 85 (2007). United States v. Jones, 531 F.3d 163, 180–83 (2d Cir. 2008).

-35-